**PROGRESS DEVELOPMENT CORPORATION, a corporation and Modern Community Developers, Inc., a corporation, Plaintiffs-Appellants,**

v.

**James C. MITCHELL et al., Defendants-Appellees.**

**No. 12976.**

United States Court of Appeals Seventh Circuit.

Jan. 4, 1961.

Rehearing Denied Jan. 27, 1961.

224

John W. Hunt, Howard Hoosin, Richard G. Kahn, Willard Wirtz, Newton N. Minow, John P. Morris, Chicago, Ill., for appellants.

Thomas A. Matthews, John B. Moser, Byron S. Matthews, Berle L. Schwartz, Chicago, Ill., for Village of Deerfield, a municipal corp., Joseph Koss, Winston Porter, Harold L. Peterson, John Aberson, Maurice Petesch and Arno Wehle, defendants-appellees.

George B. Christensen, Charles J. Calderini, Jr., Chicago, Ill., for resident defendants-appellees, Winston, Strawn, Smith & Patterson, Chicago, Ill., of counsel.

Gerald C. Snyder, Lewis D. Clarke, Waukegan, Ill., Allyn J. Franke, Chicago, Illinois, for defendant-appellee, Deerfield Park District.

Edward J. Kelly, Chicago, Ill., for appellee, Joseph C. Powell.

Before HASTINGS, Chief Judge, and DUFFY and CASTLE, Circuit Judges.

HASTINGS, Chief Judge.

Plaintiffs filed their verified complaint herein in the district court pursuant to 28 U.S.C.A. § 1331. The complaint charges a conspiracy by all defendants resulting in an alleged violation of the civil rights of plaintiffs guaranteed to them under the equal protection clause of the Fourteenth Amendment to the Constitution of the United States and contrary to the provisions of Title 42, U.S.C.A., §§ 1981, 1982, 1983, 1985 and 1988 (Civil Rights Act). The complaint sought injunctive relief and damages.

The plaintiffs below (appellants) were Progress Development Corporation, an Illinois corporation (Progress), and Modern Community Developers, Inc., a New Jersey corporation (Modern).

Progress has as its principal purposes the acquisition and development of residential subdivisions and the construction and sale of residential housing therein. Its principal place of business is in Chicago, Illinois.

Modern's principal purposes are investment by purchase of shares of stock in Progress and other similar corporations. Modern owns *all* the issued and outstanding shares of Progress. It also has a financial interest in other corporations engaged in the same type of business in Connecticut, Delaware, New Jersey, New York and Pennsylvania. Its principal place of business is in Princeton, New Jersey.

Beginning in April, 1959, and subsequent thereto, Progress acquired for residential development two unimproved tracts of real estate in the Village of Deerfield, Lake County, Illinois. One tract of approximately fifteen acres became known as Floral Park Subdivision and the other tract of approximately seven acres, as Pear Tree Subdivision.

On July 8, 1959, the plat of Floral Park Subdivision was duly approved by the Deerfield Village Board. This plat was properly recorded on July 31, 1959 and provided for 39 residential lots. Thereafter, Progress commenced the installation of water, sewer and street improve-

ments and the construction of two model homes with Village Board approval.

On September 16, 1959, the plat of Pear Tree Subdivision was approved by the Deerfield Village Board and was recorded on September 18, 1959. This plat provided for twelve home sites.

On December 7, 1959, the Deerfield Park Board took formal action to designate Floral Park and Pear Tree Subdivisions as park sites and ordered that they be acquired by condemnation proceedings for park purposes. Plaintiffs rejected an offer of the Park Board to purchase these subdivisions for $166,-199.91. In the same meeting the Park Board, by proper resolutions, provided for a referendum to be held on December 21, 1959 for the purpose of submitting to the voters of Deerfield a $550,000 bond issue, $175,000 of which was designated for the purchase of the two subdivisions owned by Progress. The remainder of the bond issue was to cover the acquisition of four other park sites of approximately 58 acres, making a total of approximately 80 acres in the six tracts.

On December 21, 1959, the bond issue referendum was held. The election carried, and the bond issue was approved by the voters.

On December 22, 1959, plaintiffs filed their verified complaint herein. The complaint, as amended, contains three separate counts.

Count I names as defendants the Deerfield Park District (Park District) and the individuals constituting the Board of the Deerfield Park District (Park Board), namely, James C. Mitchell, its president, and Dudley L. Dewey, Edward J. Walchli, Donald W. Keller and Aksel Petersen, as members thereof. The Park District is a municipal corporation organized under appropriate Illinois statutes and had a population of approximately 11,000 in 1959. The Park Board consists of five elected members who serve without pay. Count I is denominated as "Complaint Against the Park Board." It seeks a temporary injunction

*pendente lite* against the named defendants with the prayer that such injunction be made permanent upon final hearing.

Count II names as defendants the Village of Deerfield, Illinois (Village) and the individuals constituting the Board of Trustees of the Village of Deerfield (Village Trustees), namely, Joseph Koss, its president, and Winston Porter, Harold L. Peterson, John Aberson, Maurice Petesch and Arno Wehle, as members thereof. The Village is a suburban municipality organized under appropriate Illinois statutes and is governed by the Village Trustees. It is largely a "commuter" suburb located about twenty miles northwest of Chicago, Illinois. It contains two elementary school districts, Nos. 109 and 110. Floral Park and Pear Tree Subdivisions are located in District No. 110. Count II is denominated as "Complaint Against the Village Officials." It seeks a temporary injunction against the named defendants with the prayer that it be made permanent upon final hearing.

Count III names as defendants all the foregoing defendants in Counts I and II, *except* the Park District and the Village. It also names ten additional individual defendants. Two of these ten individuals, Joseph G. Powell and Alfred G. Bradt, are members of an unofficial civic organization of Village residents known as the "Deerfield Citizens Committee" (Citizens Committee) with Powell as president and Bradt as a member thereof. The other eight individuals, Harold C. Lewis, Herbert H. Garbrecht, Hal H. Petit, Robert D. Rierson, Robert G. Mullen, Leonard Bronstein, David J. Maundrell and Frank M. Blake, are members and directors of another unofficial civic organization of Village residents known as the "North Shore Residents' Association" (Residents Association) with Lewis as chairman and Garbrecht as vice-chairman. Count III is denominated as a "Complaint Against All Defendants." It charges a *conspiracy* by all individual defendants to deprive plaintiffs of the right to conduct their corporate enterprises within the safeguards

afforded by the Fourteenth Amendment and Section 1985 of the Civil Rights Act and prays damages in the sum of $750,-000.

In Count I plaintiffs seek to enjoin the defendant members of the Park Board from condemning Floral Park and Pear Tree Subdivisions and interfering with plaintiffs' possession thereof. As the ground for such relief plaintiffs charge all individual defendants named in all counts of the complaint with conspiring to induce the Park Board to abuse its lawful powers of eminent domain and thereby acquire such subdivisions "solely for the purpose of preventing Progress from building residential housing thereon and preventing sales of homes thereon to Negroes * * * all in violation of the lawful rights of Progress and of prospective purchasers of such homes."

In Count II plaintiffs seek to enjoin the defendant members of the Village Trustees from enforcing the building code of the Village in an unlawful, arbitrary and capricious manner against Progress. As the ground for such relief plaintiffs charge all individual defendants named in all counts of the complaint with conspiring to induce the Village Trustees to abuse their lawful powers of enforcing local laws and ordinances relating to the Village building code in "seeking to harass, impede, delay and otherwise prevent the construction of homes by Progress and the sale of some of said homes to Negroes" in violation of the lawful rights of plaintiffs. The same general acts of conspiracy alleged in

Count I are realleged in Count II by reference.

On the date the complaint was filed (December 22, 1959), plaintiffs moved for a temporary restraining order against the Park Board (under Count I) and the Village Trustees (under Count II). On that afternoon, after hearing oral argument, the trial court denied the motion as to the Park Board and granted it as to the Village Trustees. The Village Trustees were thereby temporarily restrained from harassing Progress by any arbitrary or discriminatory enforcement of the Village building code pending a hearing on the issuance of a preliminary injunction.

On December 24, 1959, the Park District filed proceedings in the Circuit Court of Lake County, Illinois, seeking condemnation of the two subdivisions in Deerfield owned by Progress.[1]

No answers to the complaint in the case at bar have been filed by any defendants. The Park Board, Village Trustees, Residents Association and Citizens Committee filed various motions to dismiss the complaint asserting that the court lacked jurisdiction or that the complaint was insufficient as a matter of law. In addition, certain of these motions raised what purported to be affirmative defenses. All defendants subsequently joined in all motions to dismiss. We shall consider these motions and the rulings thereon later in this opinion.

The taking of evidence on plaintiffs' motions for preliminary injunction under Counts I and II began on January 9,

1. It appears from the briefs filed in this appeal and from oral argument that subsequent to the entry of judgment by the district court, the state court condemnation proceeding went to trial. On June 28, 1960, the Circuit Court of Lake County, Illinois, in Consolidated General No. 71780, entered an order fixing the sum of $168,500 as full compensation for the taking of the premises described, and directing that title thereto be vested in the Park District upon payment of such sum to the County Treasurer of Lake County, Illinois, for the benefit of the owners. It is shown that the parties agreed on the amount of just compensation to be paid without prejudice to the rights or position of defendants therein to question on appeal any other orders or rulings of the court made in such proceeding. The sum of just compensation so fixed was paid as directed; title to such real estate was vested in the Park District, possession was taken by the Park Board and the property is now being used for park and school purposes; and the compensation so paid was *not* taken down by defendants but remains in the hands of the County Treasurer. An appeal from the order of June 28, 1960 is now pending before the Illinois Supreme Court.

1960 and continued thereafter from time to time until January 28, 1960. Following briefs and extended oral arguments, on March 4, 1960 the district court handed down its written memorandum opinion, 182 F.Supp. 681 (with findings of fact and conclusions of law) and issued its decree and orders in accordance therewith.

The trial court dissolved the temporary restraining order previously entered under Count II; denied plaintiffs' motions for preliminary injunction under Counts I and II; dismissed Modern as a party plaintiff; granted defendants' several motions to dismiss all counts of the complaint; found that no issues remained for trial by court or jury; rendered summary judgment on Count III for all defendants and dismissed the entire complaint. This appeal followed.

The first problem we face is whether the district court abused its discretion in refusing temporary equitable relief requested under Counts I and II. On January 8, 9, 11, 18, 19, and 20, the court heard evidence on the allegations of Count II and on the final day denied temporary injunctive relief against the Village Board because it found no evidence of harassment. At that time, however, the court denied a motion to dismiss Count II, although it felt "it is not in the best interests of either of the parties for this count to remain pending * * * [but] plaintiffs will not be foreclosed from again coming into court in this case if there should be occasion for it."

Consideration of evidence under Count I began immediately thereafter. These hearings took place on January 21, 22, 25, 26 and 27. Temporary injunctive relief under Count I was denied in the court's orders of March 4.

An examination of the record and the court's memorandum reveals the following relevant facts.

On November 10, 1959, Progress was in the process of constructing two model homes on its subdivided plat in Floral Park. On that day it became known to Joseph Koss, Acting President of the Village Trustees, that Progress planned to establish an integrated housing project in its subdivision. The following day, Progress' plans to sell a number of its homes to Negroes became known for the first time to the general public in Deerfield. A finding of the district court describes the ensuing turmoil in the community:

"The whole community was thrown into an uproar after November 11, 1959 when it became known to the officials and citizens of Deerfield that some of the houses that plaintiffs proposed to build would be sold to Negroes and other non-Caucasians. The court finds, however, that the ensuing turmoil was not caused solely by the fact that the public had been informed of the proposed sale of houses to Negroes. The court finds that immediately after the revelation of that news, the residents of Deerfield were bombarded with telephoned offers to purchase their homes at prices ranging from 50 to 75 per cent of their actual cost or fair market value."

That evening, at a regular meeting of the Village Trustees, President Koss received further information from plaintiffs' officials relative to their plans. No discussion of these plans took place during the meeting, but after adjournment, in an informal meeting the Village Attorney advised the Trustees to continue to act as they had in the past and no differently. Further, the Trustees agreed that Building Commissioner Bowen should discuss the problem of Progress' reported violations of the Village building code with the Village Attorney.

On the 12th, Bowen met with the Village Attorney who informed Bowen that the Board wanted him to enforce the Village ordinances as to Progress in the same manner as against any other builder, regardless of Progress' sales policy.

The next day, Bowen and Kilgore, the Village Building Inspector, visited Progress' construction sites. After finding violations of the Village building code, Bowen instructed Kilgore to shut down

the construction at one of the homes. A notice to that effect was posted. The two Village employees then visited the second site, found violations of the building code, but did not shut down work there. Subsequently, additional stop orders were issued against Progress for violations—one for a failure to furnish spot surveys after several requests and one because the eaves on the front of the homes under construction extended beyond the permissible front building line established by the Deerfield Zoning Ordinance.

In addition it was established that Progress had violated many other provisions of the Village building code and had been informed of such violations prior to November 10, 1959; that stop orders had been issued against other violating contractors both before and after the incidents complained of; and that the method of enforcement was no different in the case of Progress from that of other violators.

Starting on November 17, a series of public meetings were held, some regularly scheduled and all charged with the emotion and tension prevalent in Deerfield at that time. On the 17th, the Park Board met and heard suggestions that a referendum be called to secure additional park property for the Village. At that meeting, members of the Citizens Committee appeared and agreed to make a report on the park needs of the Village. The meeting was adjourned until December 7.

On November 18, the Village Trustees met with certain realtors for the purpose of getting information on a wave of panic-inducing phone calls from persons unknown who were making offers to purchase property in the Village at substantially depressed prices. At this meeting and at a Village Trustees meeting later in the evening, President Koss read a statement of the policy of the Village Trustees announcing their determination to uphold all state, local and federal laws. After reading this statement at the latter meeting, a member of the audience asked if Progress' land

could be condemned as a park and what the Trustees' position was on that question. The Village Attorney answered that condemnation was out of the purview of the Village Trustees' power.

On the 23rd, a public meeting attended by the Village Trustees and representatives of Modern and Progress was held. After hearing from the representatives present, when it became evident that the overflow audience wanted to be heard, the meeting was adjourned until suitable accommodations could be found.

The following evening the meeting was reconvened in the Deerfield Grammar School to a capacity audience. Many people present spoke; President Koss stated that it was necessary on several occasions to pound the gavel to keep the crowd quiet. The meeting was adjourned at 9:30, after everyone present was given an opportunity to be heard.

On December 6, the Residents Association conducted a poll of Deerfield citizens to determine their attitude toward plaintiffs' sales policies.

A further meeting between the Village Trustees and representatives of Progress and Modern was held on December 7 at which time the stop orders issued against further construction on the model homes were discussed. That same evening the Park Board met, received the report of the Citizens Committee on the park needs of the Village, adopted resolutions designating Floral Park and Pear Tree Subdivisions as park sites and ordered that these subdivisions be acquired by condemnation proceedings. In addition, four other sites were designated for park purposes. The Park Board set a referendum for December 21, 1959 for voter approval of the $550,000 bond issue to finance the purchase of these six sites. The referendum and state court condemnation proceedings followed.

There was a great deal of testimony about the need of additional parks in the Village. A series of referenda in 1959 was held in efforts to secure additional recreation areas. Such efforts were not successful, and after the April referen-

dum, a city planning firm was retained by the Park Board to study and recommend locations for additional park sites. In May, this firm recommended that Floral Park be acquired as a park site and Pear Tree as a proper location for a swimming pool. In June, 1959, the School Board of District 110 urged the Park Board to acquire Floral Park as a park site. The President of the Park Board indicated that Floral Park would not be included in the August, 1959 referendum but would be included in a later one.

In their complaint, plaintiffs alleged a web of conspiracy between the various defendants and that the official action involved was merely a sham to harass plaintiffs and to deprive them of their property and thereby preclude construction of an integrated housing project. The report of the Citizens Committee allegedly was only an excuse to condemn, and Residents poll was but a provocation. A series of alleged meetings, phone conversations and agreements completed the pattern of the alleged conspiracy.

After hearing the evidence, the court found that plaintiffs had not been harassed by city officials, that the Park Board's action in condemning plaintiffs' land was in good faith, and that there was no evidence of any conspiracy to deprive plaintiffs of their rights to own and develop their property.

We have carefully studied the entire voluminous record of the evidence adduced at the lengthy hearings and conclude that on the basis of the testimony and documents before it, the court was fully justified in denying temporary equitable relief under both Counts I and II. The trial court's findings are not only supported by substantial evidence, but our examination of the record fails to reveal to us any evidence of conspiracy. Many statements by individual defendants, which were characterized as extreme and provocative, appear to have been made in the context of public discussion and in the exercise of an individual's constitutional rights of free speech and peaceable assembly. We do not pass judgment on the propriety and wisdom of such statements relating to the cause and effect of integrated housing.

■ We hold that the trial court's findings that no conspiracy was established under the proof offered in support of Counts I and II are not clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

The denial of injunctive relief in this case "is supported by an opinion, prepared with obvious care, which analyzes the evidence and shows the reasons for the findings. * * * Findings as to design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them." The trial court found that it could not draw an inference of the alleged conspiracy and concluded that the statements and actions of defendants "bear a different meaning" from that for which plaintiffs contend. Rule 52 is clearly applicable. United States v. Yellow Cab Co., 1949, 338 U.S. 338, 340–341, 70 S.Ct. 177, 94 L.Ed. 150.

■■ Further, it is well established that the issuance of a temporary injunction rests in the sound discretion of the trial court. On appeal, an order granting or denying such an injunction will not be disturbed unless there is a clear showing of an abuse of the discretion so exercised. Meccano, Ltd. v. John Wanamaker, 1920, 253 U.S. 136, 141, 40 S.Ct. 463, 64 L.Ed. 822; Westinghouse Electric Corp. v. Free Sewing Mach. Co., 7 Cir., 1958, 256 F.2d 806, 808, and cases cited therein.

On the record before us, we hold that the district court did not abuse its discretion in denying plaintiffs' motions for a preliminary injunction.

Defendants' several motions to dismiss raise the second issue in this case: whether the court committed legal error in dismissing the three counts of the complaint. The four main grounds asserted in the various motions are:

(a) Count III fails to state a cause of action under 42 U.S.C.A. § 1985 because

plaintiffs' purpose is to maintain an illegal "controlled occupancy" plan.

(b) The Park Board members, acting in their legislative capacity in condemning plaintiffs' land, are immune from any action for damages under Count III.

(c) Plaintiffs have an adequate remedy at law in state proceedings.

(d) The restrictions of 28 U.S.C.A. § 2283 prohibit the district court from granting an injunction to stay the condemnation proceedings in the state courts.

First, as to plaintiffs' sales policy and its effect on their right to bring a damage action under Section 1985. This issue was raised early in the proceedings by motions to dismiss, and testimony as to plaintiffs' sales policy was taken in the hearings on a preliminary injunction.

Deerfield at present has no Negroes living within its village limits, although some had formerly lived there. Progress, in an attempt to get Negro purchasers into the local housing market, announced its plan to sell 10 to 12 of its 51 houses to Negroes. This percentage was determined by surveying the normal population ratio in the Chicago area which was approximately 78 to 80 per cent white and approximately 22 to 20 per cent non-Caucasian.

The nature of plaintiffs' efforts to control such percentages in the future was highly controverted before the district court. The court ordered production of purported resale agreements which would give plaintiffs a first option to repurchase the homes of their vendees. Plaintiffs point to the fact that at present no homes have been sold with such agreements and that the resale agreement is only tentative and has not been formally adopted by Progress' Board of Directors. However, the trial court found as a fact that:

"On the trial, plaintiffs were unconvincing in their attempts to avoid the stigma of forcing purchasers to execute such agreements by stating that execution of such agreements would be urged but would not be required. It is clear, and I find, from the admissions of plaintiffs' officers and attorney, and from available literature, that plaintiffs intend to control the ratio of Negroes and Caucasians living on the premises in question for ten years and plans to do it by reserving to Progress or its nominee the right to determine the purchaser of the property when an owner desires to resell."

On the basis of this finding, the district court held that as a matter of law:

"The 'controlled occupancy pattern' and resale quota system which Modern Community Developers, Inc., proposes to use in Deerfield through Progress Development Corporation is illegal both as to initial sales and resales. The power of a federal court cannot be used consistently with the Fifth Amendment and the Civil Rights Statutes to impose any percentage quota of Negro or Caucasians. Similarly, State power and authority cannot be constitutionally employed within the restrictions of the Fourteenth Amendment to control either the original or subsequent devolution of realty on a quota basis."

"A party who plans to put into effect a system of land tenure whereby ownership or occupation of land will be controlled on racial or other discriminatory basis cannot seek damages in a federal court for any interference which prevents such party from putting such plan into effect."

The court dismissed Counts I, II, and III, *inter alia,* because the rights claimed to be violated are not protected by the Fourteenth Amendment and the acts complained of are not in violation of the Civil Rights Act. In addition, it found that plaintiffs did not have "clean hands" in requesting injunctive relief.

■■ It is our considered judgment that the complaint on its face states a federal cause of action, Snowden v. Hughes, 1944, 321 U.S. 1, 7, 8, 10, 64 S. Ct. 397, 88 L.Ed. 497; Miles v. Arm-

strong, 7 Cir., 1953, 207 F.2d 284, 286, and that the resale policy of plaintiffs as found by the district court does not bar them from enforcing their rights under the relevant sections of the Civil Rights Act.[2]

The Supreme Court has held that judicial proceedings *enforcing* racially discriminatory restrictive covenants by injunction or damage actions constitute state or federal action in deprivation of the equal protection of the laws. Shelley v. Kraemer, 1948, 334 U.S. 1, 68 S. Ct. 836, 92 L.Ed. 1161; Hurd v. Hodge, 1948, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187; Barrows v. Jackson, 1953, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586. However, the Supreme Court has made clear there is no unconstitutional or "illegal" conduct involved in privately agreeing to such covenants or voluntarily adhering to them. It is only when a covenantee balks and refuses to abide by his covenant and the covenantor attempts to enforce such an agreement, that state action is involved. A suit for judicial enforcement of a resale agreement will properly test the constitutionality of plaintiffs' plan to maintain a proportion of 20 per cent Negro families in its subdivision in a village that presently has no Negro families. We find no authority holding that this issue can be raised in the manner sought by defendants in this case.

Plaintiffs are not now asking enforcement of a proposed resale agreement; they are claiming protection of their constitutional right to be free from discriminatory state action. The federal courts will entertain such a claim.

The district court dismissed the five individual members of the Park Board from Count III on the ground that they were immune from any action for damages under Section 1985 since their action was taken in a "legislative" capacity. In so doing, the district court erred.

■ The common law immunity of state legislators for their acts, recognized in Tenney v. Brandhove, 1951, 341 U.S. 367, 378–394, 71 S.Ct. 783, 95 L.Ed. 1019, does not extend to local officials charged with administering in a *discriminatory* manner the laws so as to preclude Negroes from moving into an all-white community. See, Nelson v. Knox, 6 Cir., 1958, 256 F.2d 312, 314–315; Cobb v. City of Malden, 1 Cir., 1953, 202 F.2d 701, 706–707 (concurring opinion); Hoffman v. Halden, 9 Cir., 1959, 268 F.2d 280, 299–300.

In the hearings on Counts I and II, the court properly took evidence on the conduct of the members of the Park Board and concluded that there was no indication that their purpose was to conspire to deprive plaintiffs of equal protection of the laws as alleged in the complaint. Such purpose, if proved on a trial on the merits, is a proper basis for recovery in the action under Count III of the complaint. Relevant to the argument by the Park Board that its exercise of the power of condemnation cannot be reviewed is a recent statement by the Supreme Court:

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." Gomillion v. Lightfoot, 81 S.Ct. 125, 130.

■ The court erred in dismissing Count I as a matter of law on the ground that since plaintiffs could resist the allegedly unlawful taking in the state condemnation suit, they had an adequate remedy at state law. Had plaintiffs been

---

2. Defendants Residents Association and Citizens Committee do not raise, and we do not decide, the issue of the constitutional power of Congress to create a federal cause of action against private parties conspiring with state officials to deprive plaintiffs of equal protection of the laws. Cf. Collins v. Hardyman, 1951, 341 U.S. 651, 659, 71 S.Ct. 937, 95 L.Ed. 1253; In re Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835; United States v. Harris, 1882, 106 U.S. 629, 1 S.Ct. 601, 27 L.Ed. 290.

able to prove the conspiracy alleged in Count I, equitable relief to preserve the *status quo* pending trial of Count III would have been proper. Further, permanent equitable relief was prayed for under Count I. The purpose of the pending state condemnation proceeding is to determine the question of the statutory taking of plaintiffs' land and the fixing of just compensation therefor. In the instant case, however, the jurisdiction of the federal courts was *first* invoked by plaintiffs to protect their alleged federally-created rights through the exercise of federal equity powers. In these circumstances, it cannot be said that as a matter of law the subsequent state proceeding can serve as a bar to the relief prayed for in Count I. As we have previously pointed out, the district court properly denied temporary relief on the evidence heard.

█ Finally, we find nothing in the language of Title 28, U.S.C.A. § 2283 which precludes the district court from granting equitable relief against defendants Park Board and District in the proper circumstances. This equitable power is also authorized by 28 U.S.C.A. § 1343.

The district court dismissed Modern as a party plaintiff on dual grounds: it held that Modern was an unregistered investment company within the terms of 15 U.S.C.A. § 80a–3(a) and that its contracts were void and unenforceable; further, that Modern had misrepresented several facts in its registration statements and prospectuses filed with the Securities and Exchange Commission and cannot "found a cause of action upon any believed right to sell stock under an illegal prospectus." Finally, the court indicated it felt Modern's allegations of damages were "absurd."

█ The court erred in dismissing Modern as a party plaintiff. First, there is a specific statutory exemption in the Investment Company Act for a corporation which deals primarily, as the facts here indicate, through wholly-owned subsidiaries engaged in businesses other than that of trading in securities. 15

U.S.C.A. § 80a–3(b) (1). Further, as to the allegedly false statements made by Modern as a bar to its enforcing a statutory right created by 42 U.S.C.A. § 1985, what this court said in Wood v. Reznik, 7 Cir., 1957, 248 F.2d 549, 552, is controlling here:

"'The essential purpose' of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., 'is to protect investors by requiring publication of certain information concerning securities before offered for sale.' Frost & Co. v. Coeur D'Alene Mines Corp., 1941, 312 U.S. 38, 40, 61 S.Ct. 414, 415, 85 L.Ed. 500. In that opinion the court goes on to point out that all contracts in violation thereof are not necessarily void, but are voidable only where their enforcement would tend to injure the public or would be detrimental to the public interest. Such is not the case here. * * * The public has not complained nor has it been harmed".

See also, Frost & Co. v. Coeur D'Alene Mines Corp., 1941, 312 U.S. 38, 42–43, 61 S.Ct. 414, 85 L.Ed. 500, cited above. The question of whether Modern has suffered the damages it alleged is properly a matter of proof in the trial on the merits on Count III.

Finally, we consider the action of the trial court in granting summary judgment in favor of defendants on Count III. This raises the question whether plaintiffs were afforded a full hearing on the merits of Count III. We think not.

█ Count III is an action for damages. It realleges by reference the acts of conspiracy charged in the other two counts. We agree with the trial court that it states a claim on which relief can be granted if plaintiffs are able to prove the allegations therein. Plaintiffs have demanded a trial by jury on this count. No written motion for summary judgment was filed by any defendant. However, it is conceded that a motion to dismiss may be treated as one for summary judgment under the provisions set out in Rule 12(b), Federal Rules of Civil Procedure, 28 U.S.C.A.

After reviewing the entire record, we are satisfied that the hearing below was essentially and materially for the purpose of determining plaintiffs' motions for a preliminary injunction until the case could be tried on its merits. The hearing unquestionably started out in that fashion. The trial court denied plaintiffs' motion for discovery and ordered that discovery be conducted in open court by oral depositions in order to conserve time and avoid bickering. Plaintiffs were compelled thereby to call defendants and others as adverse witnesses, and testimony so elicited was for discovery purposes. The trial court properly ordered that the ten individual defendants named only in Count III be parties to the hearing, and right of cross-examination was granted to all defendants.

The hearings from January 8 to January 20 were with reference to the allegations in Count II. The hearings from January 21 to January 27 related to Count I. The trial court granted the parties wide latitude in their proffered testimony because of the emotional overtones present. However, no hearing was held on the question of damages raised in Count III.

The daily court entries recite that the hearings were on the preliminary injunction. Plaintiffs at all times openly announced that their testimony was limited to that purpose. The trial court repeatedly admonished the parties to limit their proof to that issue. Counsel on both sides made frequent objections to testimony as being outside that issue. The trial court excluded certain testimony relating to conspiracy as not bearing on the injunctive issue. There were many references by the trial court and counsel to the effect that certain evidence was material only on the merits of the case and could not be heard or considered until there was a trial on the merits.

The question of summary judgment arose during final arguments at which time the court was considering the various motions to dismiss. Plaintiffs' counsel again emphasized that their motions for preliminary injunction were only an attempt to preserve the *status quo* until a hearing was had on Count III and that various questions raised as affirmative defenses should be considered as such on a trial of the issues under Count III. They contended that there were many disputed issues of fact remaining to be tried in a full hearing on the merits.

Plaintiffs point out that there are many witnesses remaining to be called on the issue of conspiracy in a trial under Count III. Plaintiffs were given ample opportunity to make such showing of conspiracy *as they deemed necessary* to justify the granting of equitable relief under Counts I and II. In this they failed. However, this is not to say that they should thereby be denied their right to offer such full proof as they may be able to marshal in proceeding to trial in the damage action.

Defendants argue that the lengthy hearings and extensive record demonstrate that a full hearing on the entire complaint was held. In fairness it must be stated that a great part of the testimony related to defendants' efforts to justify a dismissal of Modern as a party plaintiff and to the development of the sales plan of Progress. In addition, there was extensive testimony of adverse witnesses in the nature of discovery by oral deposition. Further, there was the commendable lenient attitude of the trial court in seeking to give all parties their day in court on the injunctive issue.

No plaintiff is required to prove his case on the merits at a preliminary hearing. The argument, after such a hearing on an equity issue, that no genuine issue of fact is disclosed is fallacious. If summary judgment is appropriate on this ground after a preliminary hearing only, then the preliminary hearing becomes in fact a trial on the merits and its whole purpose is lost. In granting summary judgment at this stage of the proceeding, the trial court denied plaintiffs their right to a trial by jury on Count III. "In the very proper endeavor to terminate a litigation before

it * * * [the district court] overlooked considerations which make the summary judgment an inappropriate means to that very desirable end." Sartor v. Arkansas Gas Corp., 1944, 321 U.S. 620, 627, 64 S.Ct. 724, 729, 88 L.Ed. 967. Summary judgment may properly be entered where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. That is not this case. It cannot be invoked to deprive litigants of their right to trial by jury if there remain genuine issues of material fact to be tried. Hartford Acc. & Indem. Co. v. Northwest National Bank, 7 Cir., 1955, 228 F.2d 391, 395, and cases therein cited.

While the district court heard considerable evidence, a final hearing on the merits did not take place. It was in the main limited to the issues of equitable relief. In its holdings the trial court should have confined itself to those issues. "We think the court committed serious error in thus dealing with the case upon motion for temporary injunction." Mayo v. Lakeland Highlands Canning Co., 1940, 309 U.S. 310, 316, 60 S. Ct. 517, 520, 84 L.Ed. 774. To the same effect, see Seagram-Distillers Corp. v. New Cut Rate Liquors, 7 Cir., 1955, 221 F.2d 815, 819–820, and Doeskin Products v. United Paper Co., 7 Cir., 1952, 195 F.2d 356, 360, 361.

 We hold that the district court erred in granting summary judgment on the complaint. It was error thus to pass on the merits of the case on the basis of a preliminary hearing on a motion for temporary injunction.

Since all parties have attempted to inject a racial issue into these proceedings, it seems appropriate to comment on the real issue involved in this litigation. The plaintiffs are two corporations organized for profit utilizing only private capital in their operations. No federal agency and no federal funds are involved. For reasons best known to themselves plaintiffs have widely advertised and proclaimed a sales policy based upon a controlled occupancy plan with a quota system they have deemed best suited for the social progress of Deerfield. Some of the citizens of the Village of Deerfield have openly voiced their objections to such a plan and in doing so have exercised their constitutional right of freedom of expression and peaceable assembly. Other citizens of that community have exercised a similar right to express an opposite viewpoint. Plaintiffs have alleged that the conduct of the former group, acting in concert with lawfully constituted Village officials, amounts to an unlawful conspiracy designed to cause such officials to subvert their lawful powers of condemnation and enforcement of local building ordinances to the end that plaintiffs are deprived of their lawful right to engage in business and make a profit. Thus far plaintiffs have failed to establish proof of such a conspiracy as will entitle them to a temporary injunction. They now have the legal right to see if they can prove such a conspiracy as the foundation for legal damages in a trial by jury. This case is that and nothing more.

In this case no *individual* claims to have been denied a personal right. No one claims he has been denied the right to purchase a home. No one claims he has been denied the right to vote, to go to school, to live in a certain place, to eat in a public place, to seek transportation without interference or to work or worship as he chooses. We are concerned with the corporate right to engage in business and make a profit. Plaintiffs are entitled to try their action for damages.

This proceeding should be remanded to the district court for a trial on Count III. If, at the conclusion of such trial, the district court, in the exercise of its discretion, finds plaintiffs are entitled to final injunctive relief, there will be ample opportunity for further consideration of this question at that appropriate time. Plaintiffs' suggestion that this court order mandatory injunctive relief at this time is denied.

The orders of the district court denying plaintiffs' motion for a preliminary

injunction under Counts I and II are affirmed.

The orders and judgment of the district court dismissing Counts I, II and III of the complaint and granting summary judgment thereon, and dismissing Modern as a party plaintiff are reversed.

This cause is ordered remanded to the district court for a trial on the merits of Count III, and for any further appropriate action not inconsistent with this opinion.

Affirmed in part; reversed in part; remanded with directions.