Mary **BERGERON** et al., Plaintiffs,

v.

The **BOARD OF REGENTS OF** the **UNIVERSITY OF WISCONSIN SYSTEM** et al., Defendants.

No. 72–C–538.

United States District Court, E. D. Wisconsin.

July 17, 1973.

Freedom Through Equality, by Edward M. Parsons, Jr., Milwaukee, Wis., for plaintiffs.

Robert W. Warren, Wisconsin Atty. Gen., by Charles A. Bleck, Madison, Wis., for defendants.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

The defendants have moved for summary judgment. The plaintiffs invoked the jurisdiction of this court pursuant to 28 U.S.C. §§ 1343(3) and (4) and 28 U. S.C. § 1331(a) seeking relief under the following provisions: the Civil Rights Act of 1964; 42 U.S.C. § 2000d et seq; 42 U.S.C. § 1983; the fourteenth amendment of the Constitution of the United States; and the declaratory judgment provisions contained in 28 U.S.C. §§ 2201 and 2202.

The constitutionality of a federally funded "Inner City Library Service Institute" (Institute) conducted at the University of Wisconsin—Milwaukee (UWM) is challenged on equal protection grounds. The plaintiffs, as former participants, allege that the Institute is a "racially discriminatory educational program." They also claim a denial of due process, urging the characterization of their dismissals from the Institute as a "disciplinary action" taken without notice or hearing. Finally, in a "pendent jurisdiction" claim, the plaintiffs charge that the defendants have broken their contract to the extent that certain stipends, tuition waivers and other privileges which accrued to the plaintiffs while they were participants in the allegedly unconstitutional Institute, were cut off.

■ On November 3, 1972, I denied the plaintiffs' motion for a temporary restraining order; such order sought to reinstate them in the Institute "with full rights and privileges, including the granting of all financial aids, stipends, dependency waivers and the other student fees" and to "provide them with certain due process protections." I denied the temporary restraining order on the grounds that the plaintiffs had not "demonstrated sufficient probability of their ultimate success to justify the issuance of a temporary restraining order."

■ This matter is now before this court on the defendants' (UWM) motion for summary judgment. If a genuine issue of fact remains to be tried after the denial of a motion for interlocutory relief, it would be error to grant summary judgment. See Progress Development Corp. v. Mitchell, 286 F.2d 222 (7th Cir. 1961). I have considered the entire record in this case, as well as the memoranda submitted by counsel, and it is my conclusion that there exists no issue of material fact. For the reasons hereinafter discussed, the defendants' motion for summary judgment should be granted; it follows that this action should be dismissed as to each of the plaintiffs' claims.

During the summer of 1971, UWM, through its School of Library and Information Science, received federal funding for the proposed Institute pursuant to 28 U.S.C. §§ 1031–34, for the academic year commencing September, 1971. The purpose of the two-year special program was to train students from disadvantaged backgrounds in library science in order to meet the needs of inner city communities. A recruitment program designed to bring minority persons into the Institute was initiated. The plaintiffs, four blacks and one Mexican-American, were among the group of 15 so recruited. They were offered appointments in the Institute. In written letters of confirmation, the students recognized that:

"The successful completion of the academic requirements of the two-year

program qualifies the participant for a Masters Degree in Library and Information Science."

In addition to receipt of the masters degree, upon completion of the two-year program, Institute participants would also receive a "Special Certificate" stating their qualification as librarians for inner city library service. In consideration of their participation, they were paid a stipend of $2400 plus $600 per dependent and were given a tuition waiver.

When the Institute began in September, 1971, the course of instruction was in its developmental stage. Participants were required to take the basic courses offered as a group, including 15–20 hours of field work designed specifically for the Institute.

There existed some duplication in titles of basic courses offered in the two-year Institute as compared to those offered in the "traditional" one-year graduate library school at UWM. However, each school's courses were geared to the needs of that school's particular constituency. The "traditional" library school's basic courses were apparently fashioned to the requirements of the more affluent library user, while the Institute's basic courses were aimed at the anticipated needs of inner city persons —non-users of traditional library resources.

The number of faculty members needed to give instruction in the special Institute was limited, since only 15 students were enrolled, and only six subjects were required for the academic year 1971–72, including field work and independent research and study as two of the courses. Once the basic courses were completed, students in both the "traditional" and the Institute programs were free to take courses in the other school.

On March 6, 1972, the plaintiffs commenced a 10-week boycott of Institute classes because they disagreed with its content, conduct and length, advising the Institute that:

"Presently, we see the entire program as a 'put off, retarded session of bullshit . . .' We no longer want to deal with or be a part of this type of program."

An ultimatum, indicating that the plaintiffs would "not negotiate for anything less than completion of the program in August, 1972", was presented to the Institute on March 21, 1972. On May 4, 1972, the Institute advised each of the plaintiffs of her unexcused absences and asked her to arrange to have her graduate standing determined. Only one of the plaintiffs complied with the May 4 directive. Each plaintiff received a grade of "incomplete" for that term's coursework. Each plaintiff continued to receive her stipends throughout the period of the boycott.

Sometime prior to June 19, 1972, the plaintiffs attempted to register for the eight-week summer session at UWM without the payment of normal fees and were informed that only Institute participants received the tuition waiver privilege. Prior to this, the Institute had notified each of the plaintiffs that she could renew or continue under the program and, therefore, receive the fee waiver privilege if she agreed to elect in writing one of the following two options: (1) participation in the original two-year masters degree, plus "Special Certificate" program, or (2) the earning of a masters degree alone, within a shorter time specified by the participant's transcript subject to the rules and regulations of the "traditional" school.

This policy change was designed to eliminate the plaintiffs' dissatisfaction with the initial two-year requirement of the program. One day after the plaintiffs' attempt to register for the summer session on a fee waiver basis, on June 20, the Institute gave one of the plaintiffs, who inquired with regard to the matter by telephone, an opportunity to select the modified program option. However, the Institute never received the requested written notice. The June 30 deadline passed. Since none of the five plaintiffs had advised the Institute

in writing that she would participate in the special program under either of the options, the plaintiffs were officially deemed to have elected to withdraw from the Institute.

Their subsequent requests to make up the grades of incomplete were granted. The plaintiffs have at all times remained free to enroll in any school of UWM, upon the meeting of normal academic requirements and other general requirements such as payment of tuition, but they are ineligible for the Institute.

■ The plaintiffs' equal protection attack upon the constitutionality of the Institute is without merit. The fact that the "traditional" library graduate school's racial composition is primarily, if not entirely, white, while that of the Institute is brown and black, makes out neither a de jure nor a de facto segregation case of the type envisioned by equal protection considerations.

■ Two entirely separate programs are involved here, irrespective of racial composition, each one designed for the needs of different constituencies. No showing has been made that the plaintiffs were not free to enroll in the "traditional" library school had they so chosen. Any segregation which may have occurred resulted solely because of course content dictated by the needs of experimental programs. Therefore, the facts that the Institute participants were required to take their instruction as a group and that certain basic course titles were duplicated in the "traditional" and in the special programs are unpersuasive as indicia of the alleged presence of a racially discriminatory educational program. The fact that an Institute participant is required to endure two years of training prior to receiving a "masters degree-plus" while a "traditional" student is able to garner a masters degree alone in but one year, does not demonstrate actionable discrimination.

Participants were recruited with a view to the development of curriculum and course content as the Institute grew. They take part in and receive credit for certain types of educational experiences and training specialization which are unavailable to students in the "traditional" school. For example, the Institute required 15–20 hours of field work during the second semester, such as working at informational centers located at day care centers and community schools; such field is not covered by the "traditional" graduate program. The fact that each participant entered the special program with full knowledge of its experimental nature and the two-year commitment on the one hand, while accepting financial and potential degree-certificate rewards on the other, supports the conclusion that each one assumed at least some of the "risk" of frustration, if any, which attends the inauguration of any new program. I believe that the facts clearly demonstrate a sustained, even-handed, good-faith effort on the part of the Institute to ascertain and respond to the demands of the plaintiffs and other participants; such effort is inconsistent with the charges of discrimination.

■ The plaintiffs' "due process" claim concerning the ultimate decision as to their ineligibility for further Institute participation is based upon their characterization of the Institute decision as a "disciplinary action" taken without notice or hearing. However, such a characterization is not supported by the record. The decision involved here was not entered into lightly or summarily, but it came after a protracted period of time. During such time, repeated notice was advanced to the plaintiffs concerning possible consequences of their continued non-cooperation. The decision itself involved no disciplining of the plaintiffs. As noted, they remain free to enroll at any school at UWM, but not on a tuition waiver basis. The plaintiffs' conscious refusal to take advantage of a privilege of participation proferred by the Institute, while they were cognizant of the consequences of their actions,

cannot fairly be characterized as a "disciplinary action" on the part of UWM.

 The plaintiffs themselves created a situation inviting an administrative or academic decision. The plaintiffs boycotted classes because the University would not change the structure of an experimental program, which is not itself unconstitutional and in which they freely enrolled. The fact that the board of regents of the university of Wisconsin have provided for termination of student aid as one method of disciplining a student for misconduct is no basis for the claim that what is involved here approaches "disciplinary action". This is especially true in view of the fact that UWM actually offered the plaintiffs two flexible options under which they might continue to receive Institute privileges. This is not a situation involving expulsion or suspension for misconduct.

 Finally, the plaintiffs urge this court to consider their claim for breach of contract, based upon a theory of pendent jurisdiction. See United Mineworkers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The contract created by the plaintiffs' confirmation of their acceptance as Institute participants stated in part that "the successful completion of the academic requirements of the two-year program qualifies the participants for a Master's Degree." Obviously, an "incomplete" is not successful completion of course material. The communication of March, 6, the fact of non-attendance of classes for ten weeks, and their subsequent failure to accept the options offered them under the program, shows that the plaintiffs did in fact withdraw from the program; having withdrawn, they were not entitled to a tuition waiver under the program for the summer or subsequent sessions.

I conclude that the defendants did not break their contract with the plaintiffs. The issue of whether the plaintiffs are guilty of a contract violation on these facts has not been joined and, thus, will not be discussed.

Therefore, it is ordered that the defendants' motion for summary judgment be and hereby is granted.

It is also ordered that this action be and hereby is dismissed.