**SONY/ATV PUBLISHING, LLC, a Delaware Limited Liability Company, et al., Plaintiff–Appellee,**

v.

**Gai MARCOS, Individually; 1729172 Ontario, Inc., a Canadian corporation, dba Tricerasoft.com, dba Selectkaraoke.com, dba Karaokedownloads.ca, Defendants–Appellants.**

No. 15–6108

United States Court of Appeals, Sixth Circuit.

FILED June 09, 2016

483

Timothy L. Warnock, Riley, Warnock & Jacobson, Nashville, TN, for Plaintiff–Appellee.

Ramona P. DeSalvo, DeSalvo Law Firm, Nashville, TN, for Defendants–Appellants.

BEFORE: COOK and KETHLEDGE, Circuit Judges; SARGUS, District Judge.*

COOK, Circuit Judge.

This appeal challenges a preliminary injunction enjoining karaoke recording distributor 1729172 Ontario, Inc. and its president (collectively Ontario) from using musical compositions to which Sony/ATV Publishing, LLC and EMI Music Publishing, Ltd. (collectively Publishers) claim various ownership interests. Discerning no abuse of discretion, we uphold the injunction.

* The Honorable Edmund A. Sargus, Chief United States District Judge for the Southern Dis-   trict of Ohio, sitting by designation.

## I.

Publishers hold the rights to record, reproduce, distribute, advertise, or otherwise exploit thousands of musical compositions. As is customary in the music industry, Publishers make money by licensing these compositions for various uses—including the reproduction and distribution of karaoke recordings. Ontario is in the karaoke business and maintains websites through which it sells karaoke recordings via digital download, digital streaming, and physical CDs. Some six thousand of the musical compositions owned by Publishers (the Subject Works) are among the karaoke recordings Ontario sells.

Publishers sued for copyright infringement, claiming that Ontario's reproduction and distribution of the Subject Works was unlicensed. See 17 U.S.C. § 106. Ontario responded by presenting various domestic and international licenses obtained from Publishers and their agents. It claimed that these licenses authorized international third parties (the Karaoke Labels) to manufacture the karaoke recordings and Ontario to reproduce and distribute those recordings in the United States. Publishers, on the other hand, argued that these various licenses either expired or did not authorize Ontario's use of the Subject Works.

Publishers moved for a preliminary injunction. After reviewing a great deal of evidence, the district court determined that Ontario's licenses did not authorize its use of the Subject Works and enjoined Ontario from "copying, recording, manufacturing, advertising, distributing, selling, offering for sale, transmitting or otherwise exploiting or causing to be used in any manner in the United States . . . the musical compositions owned and/or administrated by [Publishers]." Ontario appeals.

## II.

A district court may grant a preliminary injunction if the movant shows a substantial likelihood of success on the merits, that the movant will suffer irreparable harm absent relief, that the balance of equities weighs in the movant's favor, and that the injunction serves the public interest. See Obama for Am. v. Husted, 697 F.3d 423, 428 (6th Cir. 2012) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). Ontario challenges the district court's assessment of the first three factors, and further claims that the preliminary injunction is overly broad.

We review the decision to grant a preliminary injunction for abuse of discretion. Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 399 (6th Cir. 1997) (quoting Washington v. Reno, 35 F.3d 1093, 1098 (6th Cir. 1994)). As to each factor, we review the district court's legal conclusions de novo and its factual findings for clear error. See id. (citing In re Eagle–Picher Indus., Inc., 963 F.2d 855, 858 (6th Cir. 1992) ). No single factor is dispositive, and the "district court's weighing and balancing of the equities is overruled only in the rarest of cases." Id. at 400 (internal quotation marks omitted) (citing Eagle–Picher, 963 F.2d at 858).

### A. Substantial Likelihood of Success on the Merits

To prevail on their copyright infringement claim, Publishers must demonstrate (1) ownership of the Subject Works, and (2) that Ontario infringed that ownership. See Fogerty v. MGM Grp. Holdings Corp., 379 F.3d 348, 352 (6th Cir. 2004) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)). Ontario contends that the district court erred in assessing Publishers' likelihood of success on both is-

sues. As a question of law, we review de novo the district court's determination that Publishers showed a substantial likelihood of success on the merits. *See Babler v. Futhey*, 618 F.3d 514, 520 (6th Cir. 2010) (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007)).

### 1. Ownership

■ Ontario argues that Publishers insufficiently demonstrated a substantial likelihood of establishing ownership of the Subject Works. Yet both Sony/ATV's Senior Vice President of Business and Legal Affairs as well as its Vice President of Global Copyright Administration offered sworn declarations regarding Publishers' ownership. Business records, including certificates of registration and financial split sheets, reflecting Publishers' interest in the Subject Works, bolstered these declarations.

While Ontario contests the declarants' personal knowledge and asserts that the business records are incomplete or inconclusive, it forgets that Publishers need not prove their case in full at this stage. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (citing *Progress Dev. Corp. v. Mitchell*, 286 F.2d 222 (7th Cir. 1961)). Indeed, "a preliminary injunction is customarily granted on the basis of ... evidence that is less complete than in a trial on the merits." *Id.* Contrary to Ontario's suggestion, Publishers need not offer conclusive proof of ownership as to each of the over six thousand Subject Works in order to show a substantial likelihood of success on the merits. *See Six Clinics Holding Corp.*, 119 F.3d at 402 (noting that a court may grant a preliminary injunction "if the [movant] has raised questions going to the merits so serious, substantial, difficult, and doubtful as to

make them a fair ground for litigation and thus for more deliberate investigation").

### 2. Infringement

■ Ontario next maintains that four sources license its business: (a) the Harry Fox Agency (HFA); (b) the Mechanical–Copyright Protection Society/Performing Rights Society (MCPS/PRS); (c) the Karaoke Labels; and (d) Publishers and co-publishers of the Subject Works. A valid license is an affirmative defense to copyright infringement. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Ontario thus asserts that Publishers are unlikely to succeed in showing infringement.

#### a. HFA License

Ontario defends against Publishers' infringement claim by maintaining that its HFA license authorizes its exploitation of the Subject Works. But Ontario's HFA license clearly states:

> [Ontario] agree[s] that [it] [is] not granted any so-called "karaoke" or "singalong" rights to Lyrics.... [Ontario] agree[s] not to assign, transfer or transmit any Lyrics to any third party.

Moreover, the HFA license is a standard compulsory license limited to distribution of phonorecords and incorporates the statutory definition of that term, which *excludes* "audiovisual work[s]." *See* 17 U.S.C. § 101. Karaoke recordings are audiovisual works in that they "consist of a series of related images"—in this case the lyrics— "which are intrinsically intended to be shown by the use of machines or devices ... together with accompanying sounds." *Id.*

Ontario gives two answers. First, it denies distributing karaoke recordings, claiming instead to sell MP3+G files, which consist of a sound recording file

(MP3) and a separate graphic file with the lyrics (+G). Ontario says that its run-of-the-mill HFA license authorizes this distribution scheme because the two files are technically independent and create an audiovisual work only when played in unison by the consumer. It fails to persuade. And other courts have rejected similar technological efforts to bypass obtaining additional licenses. *See, e.g., ABKCO Music, Inc. v. Stellar Records, Inc.,* 96 F.3d 60, 65 (2d Cir. 1996) (rejecting the defendant's contention that physical "CD + G's" are phonorecords falling within the grant of a compulsory license); *Leadsinger, Inc. v. BMG Music Pub.,* 512 F.3d 522, 529 (9th Cir. 2008) (holding that a microchip containing sound recordings and images of the corresponding lyrics constituted an audiovisual work exceeding the scope of a compulsory license).

Pivoting, Ontario avers that it negotiated a unique karaoke distribution agreement with the HFA. The HFA representative with whom Ontario dealt, however, declared that although they discussed karaoke, the parties reached no special agreement. In any event, the HFA contract includes an integration clause precluding prior negotiations from altering its plain meaning.

### b. MCPS/PRS License

Ontario next claims that the district court mistakenly concluded that no MCPS/PRS license authorized Ontario's use of the Subject Work. Specifically, it argues that the district court erred in finding that the license expired, limited exploitation to the United Kingdom, and prohibited offering physical products for distribution by mail. The MCPS/PRS license's plain language belies these purported errors.

First, Ontario's MCPS/PRS license lapsed by its own terms on June 30, 2014. Ontario retorts that the license automati-cally renewed for want of written termination notice on June 30, 2014, and again on June 30, 2015, and therefore remains in effect. But Publishers submitted an email MCPS/PRS sent Ontario on February 17, 2015, refusing to renew the contract because Ontario abused the license by relying on it to distribute works in the United States.

Second, even if MCPS/PRS license were still in effect, it explicitly limited exploitation to the United Kingdom. A sworn declaration from the Senior Lawyer for Legal and Business Affairs and Head of Litigation, Enforcement, and Anti-Piracy at MCPS/PRS confirmed that no part of Ontario's license permitted distribution of the Subject Works in the United States. And Ontario's claim that it may lawfully maintain the Subject Works on computer servers in Canada is of no consequence to these territorial restrictions on distribution.

Third, the MCPS/PRS license expressly "[did] not authori[z]e the manufacture or distribution of physical products containing [licensed works], such as ... the ordering of compact discs." Ontario claims compliance with this clause, suggesting it merely solicits online orders, which it sends to international partners who independently manufacture and mail CDs to the United States. Yet these discs bear only Ontario's name and list only Ontario's return mailing address. The district court did not clearly err in finding these acts unlicensed.

### c. Karaoke Labels

Pushing on, Ontario asserts that the district court misinterpreted its licensing and distribution agreements with its international partners, the Karaoke Labels. It explains that the Karaoke Labels possess their own MCPS/PRS licenses that specifically authorize the manufacture of karaoke recordings, and that Ontario simply dis-

tributes these licensed recordings on its websites. But nothing in the Karaoke Labels' licenses authorize distributing karaoke recordings via digital download in the United States. Accordingly, Ontario can claim no valid sub-license authorizing it to duplicate and distribute recordings in the United States.

#### d. Publishers and Co-publishers

Finally, Ontario purports to possess licenses directly from Publishers and co-publishers of the Subject Works. Ontario conceded, however, that any licenses from Publishers expired in 2014. Similarly, Ontario's co-publisher licenses expired due to lapse of time.[1]

### B. Irreparable Harm to Publishers

Moving to the next factor, Ontario submits that Publishers will not suffer irreparable harm absent an injunction. In a copyright-infringement action a plaintiff establishes a rebuttable presumption of irreparable harm by demonstrating a likelihood of success on the merits. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532–33 (6th Cir. 2004) (citing *Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 267 (6th Cir. 1988)). As explained, Publishers enjoy this presumption. And Ontario's rebuttal that Publishers' harm is exaggerated and speculative lacks merit for want of reasoning.

### C. Balance of Equities

Ontario maintains that the district court inaccurately assessed the equitable factors because the preliminary injunction causes Ontario to suffer business, brand, trademark, and reputational losses. Yet the district court considered and balanced these concerns, concluding that Ontario's business investment was of secondary concern. *See Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983) ("The size of the infringer should not be determinative of the copyright holder's ability to get prompt judicial redress."). Ontario alerts us to no erroneous finding or application of law necessitating a reweighing of the equities.

### D. Preliminary Injunction is Overly Broad

Even if equitable relief is warranted, Ontario submits, the preliminary injunction is overly broad because it provides insufficient notice, extends retroactively, prohibits Ontario from advertising and offering for sale the Subject Works, and restricts third parties. A preliminary injunction must be no more burdensome than necessary to provide a plaintiff complete relief, and a district court abuses its discretion in ordering an overly broad injunction. *See Califano v. Yamasaki*, 442 U.S. 682, 702, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *c.f. How v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015).

■ First, Ontario insists that the injunction provides insufficient notice because the order applies to all musical compositions owned or administrated by Publishers, not just the over six thousand Subject Works already identified. But Ontario overlooks the order's other features. Indeed, the district court constructed a robust compliance mechanism to identify other potentially infringing works, specifically dictating:

---

1. After the district court ordered the preliminary injunction, Ontario presented letters suggesting that two of its co-publisher licenses may still be in effect due to ongoing royalty payments. The district court could not have known about these implied licenses and did not clearly err in finding them expired. Ontario may present this evidence in a motion to modify the preliminary injunction.

In order to facilitate compliance with this Order, Defendants shall disclose to Plaintiffs, in writing within 21 days of the entry of this Order, all karaoke recordings that Defendants have advertised, made available for sale, distributed and/or sold since the inception of its internet sales operations, whenever the inception may have occurred, until the present time. Plaintiffs shall review and notify the Defendants within 21 days thereafter of any additional musical compositions owned or controlled by Plaintiffs that Defendants have exploited and that Plaintiffs believe are not licensed. Within 21 days thereafter, and in the event Defendants cannot verify that the additional karaoke recordings are actually licensed, this Preliminary Injunction shall be modified to include the additional unlicensed karaoke recordings and the notifications and time for performance by Defendants, as set forth below, shall apply equally to such additional karaoke recordings.

The order also establishes a notice-and-cure period to protect Ontario from unwitting contempt. In granting equitable relief, district courts enjoy broad discretion to fashion remedies balancing divergent interests. *See, e.g., Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 460 (6th Cir. 2004). And "[c]ourts have extended injunctive relief beyond the four corners of the litigated copyrighted works to cover non-litigated items of similar character" when the threat of future infringement is real. *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1161 (9th Cir. 2011); *see also Walt Disney Co. v. Powell*, 897 F.2d 565, 568 (D.C. Cir. 1990). Here, given the considerable number of musical composi-

tions and licensing schemes, as well as the serious potential for ongoing infringement,[2] we conclude that the injunction and compliance order provide Ontario "fair warning" of "what [conduct] is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Next, Ontario argues that the preliminary injunction is impermissibly broad because the compliance mechanism requires Ontario to disclose all karaoke recordings "since the inception of its internet sales operations." Ontario reasons that because it began its business in 2007, the order's scope exceeds the Copyright statute's three-year limitations period. *See* 17 U.S.C. § 507(b). But regardless of any potential limitations defense Ontario may later assert, the injunction is not "retroactive." Rather, it requires disclosure of Ontario's past exploitations to help identify the relevant musical compositions and prevent future infringement.

Ontario also challenges the preliminary injunction's limitations on advertising and offering for sale the enjoined works in the United States, suggesting that these privileges are not among Publishers' exclusive copyrights. *See* 17 U.S.C. § 106. Although the parties vigorously dispute whether § 106(3)'s distribution right includes a "making available right," we offer no comment on this issue because the injunction restricts acts reasonably likely to further copyright infringement. *See, e.g.*, 17 U.S.C. § 502(a) (federal courts may grant "injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright"); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) ("The purpose of

---

**2.** For at least four months, Ontario misrepresented its online business practices to the district court. Though Ontario maintained that it had removed all Subject Works from its websites—thereby mooting Publishers' application for injunctive relief—in fact, Ontario continued to sell and make available for sale the Subject Works in the United States, except for Tennessee, Wyoming, and California.

an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs." (citation omitted)).

Last, Ontario argues that because the order enjoins works not exclusively owned by Publishers, it impermissibly restricts third parties. *See Bridgeport Music, Inc. v. DJ Yella Muzick*, 99 Fed.Appx. 686, 691 (6th Cir. 2004) ("A license from a co-owner of a copyrighted work is a defense to a claim of copyright infringement brought by any other co-owner." (citing *McKay v. Columbia Broad. Sys., Inc.*, 324 F.2d 762, 763 (2d Cir. 1963))). This is currently of no concern because, as noted above, Ontario presents no valid licenses from any co-publishers. If Ontario obtains such a license, it may move to modify the injunction accordingly.

### III.

Discerning no abuse of discretion, we AFFIRM the order.