HARRISON-HALSTED COMMUNITY GROUP, INC., et al., Plaintiffs-Appellants,

v.

HOUSING AND HOME FINANCE AGENCY et al., Defendants-Appellees.

No. 13860.

United States Court of Appeals
Seventh Circuit.

Nov. 28, 1962.

Frederic D. Houghteling, Chicago, Ill., George W. Overton, F. Raymond Marks Jr., Donald Page Moore, Chicago, Ill., Overton, Marks, Simons & Moore, Chicago, Ill., of counsel, for appellants.

James J. Costello, Legal Counsel of The University of Illinois, Albert E. Jenner, Jr., Keith F. Bode, Chicago, Ill., Thompson, Raymond, Mayer & Jenner, Chicago, Ill., of counsel, for The Board of Trustees of University of Illinois.

John C. Melaniphy, Corporation Counsel of City of Chicago, and Thomas A. Foran, Sp. Asst. Corporation Counsel, for City of Chicago, Chicago Community Conservation Board and Chicago Plan Commission.

Milton P. Webster, Jr., Asst. Corporation Counsel, Chicago, Ill., for Chicago Land Clearance Commission.

William G. Clark, Atty. Gen., State of Illinois, William C. Wines, and Harold G. Andrews, Asst. Attys. Gen., Chicago, Ill., for Illinois State Housing Board.

James P. O'Brien, U. S. Atty., John Peter Lulinski, Thomas W. James Asst. U. S. Attys., of counsel, Chicago, Ill., for other appellees.

Before DUFFY, SWYGERT and MAJOR, Circuit Judges.

DUFFY, Circuit Judge.

Plaintiffs brought this suit seeking a declaratory judgment and an injunction to prevent defendant Governmental Agencies from proceeding with plans to acquire and clear, under an urban renewal program, an area on the near west side of Chicago, for the use of the University of Illinois. The University desires to use the property as a campus for the University of Illinois—Chicago.

The District Court dismissed, before trial, both the original complaint and the amended complaint. Errors alleged by appellants are the District Court's interpretation of the jurisdictional statutes; its interpretation of the Federal Housing Act; and its interpretation of the allegations of the amended complaint.

All parties to this suit have cooperated in expediting this appeal. By order of this Court, the time for filing briefs was advanced. In spite of the shortened periods, the points at issue were thoroughly covered. Appellants filed a 139 page main brief and a 20 page reply brief. Appellees filed a 75 page brief. The HHFA and the Housing and Finance Administrator also filed a brief. The time for hearing oral argument was likewise advanced so that such argument was held slightly more than four months after the entry of the order of dismissal in the District Court.

This action involves an area of the City of Chicago sometimes called the "Near West Side Neighborhood" which, for the purposes of this case, is divided into four parts. The *Harrison-Halsted Tract* is a square area of some 55.5 acres in the northeast corner of the Neighborhood. Immediately south of it is the *Roosevelt-Blue Island Tract*, occupying some 48.7 acres. Along the north edge of the Neighborhood stretches the *Congress-Racine Tract*, an irregular shaped area one mile in length, averaging 1/10 of a mile in width, and comprising some 59.4 acres. The rest of the Neighborhood is occupied by the *Near West Side Conservation Area*. This Conservation Area originally extended as far north as the Congress Expressway, but in February 1961, its northern quarter was separated and redesignated as the *Congress-Racine Tract*.

Plaintiffs herein include Harrison-Halsted Community Group, Inc., an Illinois not-for-profit corporation. Plaintiffs' brief asserts Harrison-Halsted Community Group, Inc. is the designated representative of all of the individual plaintiffs

in protecting their interests and particularly in bringing and prosecuting this action.

There are also 282 individual plaintiffs of whom 104 own property in the areas hereinbefore described. Other plaintiffs own businesses, and 144 of the plaintiffs reside within the area. Other individual plaintiffs named do not belong to any of the foregoing categories, but are listed as parties plaintiff because of their alleged reliance upon past promises and representations of certain of the defendants.

The defendants are all governmental agencies involved in the challenged urban renewal projects. Listed are the federal Housing and Home Finance Agency (HHFA), and its administrator, Robert C. Weaver. Also listed is the Chicago Land Clearance Commission which, until recently, was the agency of the City of Chicago charged with carrying on slum clearance projects in that city.[1] Another defendant is the City of Chicago together with two of its agencies, 1) the Chicago Community Conservation Board[2] and 2) the Chicago Plan Commission.

Still another defendant is the Illinois State Housing Board, a state agency charged with approving all urban renewal projects, both clearance and conservation. The final defendant is the University of Illinois for whose benefit the project areas in question are sought to be acquired.

The Near West Side Neighborhood is one of the oldest residential areas in Chicago. Many families have lived there for more than a generation. Residents and property owners in the area realized that portions thereof had deteriorated and were in need of renewal. A Near West Side Planning Board was formed. This was a voluntary civic organization sponsored by Hull House. At least, in part, due to the activities of this Planning Board, the Harrison-Halsted Tract was designated as a slum and blighted area in September 1956. On January 16, 1958,

the Land Clearance Commission adopted the Harrison-Halsted Redevelopment Plan which called for the clearance of most of the Tract, and its development as a residential area for moderate income families. The Redevelopment Plan was approved by the City, the State Housing Board and the HHFA. On May 16, 1958, HHFA entered into a loan-and-grant contract with the Land Clearance Commission for the carrying out of the project. By mid-1960, much of the Tract had been cleared.

In May 1956, most of the balance of the Neighborhood, or that part west of the west line of the Harrison-Halsted Tract (with the exception of Jane Addams Homes) was designated as a conservation area to be redeveloped by rehabilitation and spot clearance.

Plaintiffs claim that following the adoption of the Harrison-Halsted Redevelopment Plan, numerous persons including some of the plaintiffs, began acting in reliance thereon. Residents of the Harrison-Halsted Tract and owners of businesses therein, relocated in adjacent areas with the expectation of returning after Harrison-Halsted had been redeveloped. Plaintiffs claim that property owners refrained from raising objections which they might otherwise have done. Also, that a new parish school, replacing one that had been destroyed for being in the path of the South Expressway, was built in the heart of the Harrison-Halsted Tract upon assurance by City and Land Clearance Commission officials that it would fit in with the redevelopment plan for the area. This school was completed in 1959, but if the plans here challenged are executed, this school building will be demolished. Some of the plaintiffs contributed to the building of the school.

For some years, the University of Illinois had been seeking a location for a new campus to replace its present facili-

---

1. On July 25, 1962, the Land Clearance Commission was merged into the City of Chicago's Department of Urban Renewal.

2. Until this Board merged on January 1, 1962, into the City's Department of Urban Renewal, it was charged with the duty of carrying out community conservation projects in the City of Chicago.

ties at Navy Pier.[3] When asked on oral argument why the University itself did not proceed to acquire land by condemnation, counsel answered that the University was unable financially to meet the expense that would be involved by such a procedure. It is without dispute that the proposed land acquisition is being financed in material measure by the grant of federal subsidy funds under the Federal Housing Act of 1949.

Apparently, some time in 1960, the City began to consider the possibility of using the Harrison-Halsted Tract, by then largely cleared, as a nucleus of a university site. Plaintiffs claim this consideration was kept a high-level secret, that no member of the Near West Side community was consulted, and that public officials concerned continued to reiterate their promises of a residential redevelopment as originally planned.

On February 10, 1961, the Mayor of Chicago announced to the press that he had reached an agreement with the University Trustees on a site for a campus. The so-called railroad terminal site was abandoned. Instead, the campus was to occupy the Harrison-Halsted Tract and two adjacent areas needed to provide the acreage [4] which the University desired.

Plaintiffs claim the Land Clearance Commission hurriedly surveyed the adjacent Roosevelt-Blue Island and Congress-Racine Tracts. On March 29, 1961, the Land Clearance Commission adopted a series of five resolutions, designating the Roosevelt-Blue Island and Congress-Racine Tracts as slum and blighted areas, and revised its earlier Harrison-Halsted Redevelopment Plan to provide that the entire area (except 3 acres along Morgan Street) should be turned over to the University, and adopting redevelopment plans calling for all of the Roosevelt-Blue Island and about half of the Congress-Racine Tracts to be turned over to the University. The rest of the Congress-Racine Tract and the three acres on Morgan, were designated for University-oriented private housing.

The Land Clearance Commission held no hearings on its resolutions. Following the approval of these resolutions, the Planning and Housing Committee of the Chicago City Council held a hearing on them on April 13, 1961. Objectors were permitted to appear and make statements, but were not permitted to subpoena witnesses, or documents, or cross-examine City and Land Clearance officials.

The Chicago City Council adopted ordinances approving the University site project plans of May 22, 1961. The State Housing Board thereafter announced it would hold hearings of its own on the designations of Roosevelt-Blue Island and Congress-Racine Tracts. The Board agreed, upon demand of plaintiffs herein, to allow them to produce witnesses and to cross-examine the witnesses for the City and the Land Clearance Commission.

The hearing by the State Housing Board convened on July 21, 1961. On July 27, after less than two days of testimony and before objectors had an opportunity to present their own evidence, the Board abruptly terminated the hearing. Objectors (plaintiffs herein) petitioned for a rehearing, but the Board announced its approval of the University site project plans and forwarded them to the HHFA for final approval.

The objectors filed briefs with HHFA in an effort to show why the project plans should not be approved, but HHFA and its Administrator held no hearings on these plans. However, on March 21, 1962, the Administrator announced to the press that he had approved the projects and had entered into loan-and-grant contracts.

Certain additional allegations of the complaint will be mentioned. Plaintiffs say that currently there resides in the Harrison-Halsted, Roosevelt-Blue Island and Congress-Racine Tracts, members of

---

3. The Illinois General Assembly has expressly authorized the Board of Trustees to establish a Chicago branch of the University (Ill.Rev.Stat.1961) Ch. 144, § 40a.)

4. About 105 acres.

two minority groups, Negroes and Mexicans, against whom there is, at the present time, in Chicago, extensive discrimination in housing. That the University site project will force these people out of the area. This loss in minority group housing is not being replaced elsewhere in the community.

Plaintiffs allege that part of the Near West Side Conservation Area which was later designated as the Congress-Racine Tract, constitutes the least deteriorated portion of the Near West Side Conservation Area; that a substantial portion of said Tract is occupied by modern light industrial structures, while most of the remaining part is occupied by perfectly sound residential structures. The plaintiffs complain that the Land Clearance Commission never explained why the earlier determination of the Community Conservation Board that this area was not slum and blighted was incorrect and should be reversed. Plaintiffs allege that neither the Roosevelt-Blue Island nor the Congress-Racine Tract is, in fact, a slum and blighted area, and that the designation as such by defendants greatly reduced the market value of properties located in such Tracts.

Plaintiffs assert the District Court had jurisdiction of this suit on two grounds: 1) federal question jurisdiction under 28 U.S.C. § 1331, and 2) the jurisdiction to review federal agency action under Section 10 of the Administrative Procedure Act.

Plaintiffs argue the amended complaint sets forth in sufficient detail, facts showing the violation by defendants of a series of provisions of the federal Housing Act and the regulations and directives of the Housing and Home Finance Agency (HHFA); also, that the amended complaint adequately alleges plaintiffs are being deprived of their property by defendant governmental agencies without due process of law and without just compensation.

Plaintiffs urge the action of the Housing and Home Finance Administrator, in approving the three project applications at issue, was erroneous and that his action in executing contracts with the Chicago Land Clearance Commission was a final and reviewable agency action. Plaintiffs assert they have standing to raise the foregoing questions of federal law.

On April 17, 1962, the Land Clearance Commission filed its first condemnation suit pertaining to property with which we are here concerned. Three days thereafter, the instant suit was filed.

It is understandable that many of the plaintiffs and others similarly situated feel that there has been a breach of faith by various public officials by reason of the abrupt change in plans from a typically urban renewal plan to the campus project now proposed. The members of the church who saw their school demolished to make way for an expressway, and who built a new school (finished in 1959) on a site selected only after consultation with representatives of some of the defendant governmental agencies, must indeed experience a sense of frustration. To the ears of the plaintiffs, there is a hollow ring to the claim that the campus project is a mere modification of the original development plan when it is considered the campus project involves about three times as much area as the original plan.

Nevertheless, and in spite of the outraged feelings of many people who have interests in this area, we have in mind that questions arising from the taking of property by condemnation for state purposes, are ordinarily matters for determination by the state courts. The plaintiffs in this case have sought relief in a federal court. Whether they may properly do so depends principally on whether they have a standing to sue and whether a substantial federal question is involved.

We think it is well settled that in a private suit in a federal court, where it is claimed that a substantial federal question is involved, it must clearly appear that defendant's acts constituted the invasion of plaintiffs' private legal rights. Frothingham v. Mellon, Secretary of the Treasury et al., 262 U.S. 447, 43 S.Ct. 597,

**104**

67 L.Ed. 1078. In the Frothingham case, a taxpayer brought a suit to enjoin expenditure of federal funds under a federal subsidy statute. The Court said, page 488, 43 S.Ct. 601: "* * * The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally."

The federal Housing Act of 1949 is a subsidy statute which provides for federal grants of aid to local governmental units. Both Senate and House Committee reports stated " * * * that every project assisted be a local undertaking, locally planned, locally approved, locally managed and designed to serve local needs." (Senate Report No. 84, 81st Cong., 1st Sess., p. 37.) It is obvious that none of the plaintiffs is or was a party to the subsidy contract.

■ When a subsidy application is approved by the Administrator of the HHFA, contracts are entered into by the Agency and the local governmental body, here, the Chicago Land Clearance Commission. Congress did provide certain standards to guide the Administrator in the exercise of his discretion. But, such provisions and regulations thereunder do, not confer legal rights upon plaintiffs, as individuals, separate from their position as members of the general public.

ƒ The Housing Act of 1949 contains no provision for a hearing before the HHFA. It contains no provision for a judicial review. ƒ Very recently, we held the Federal Communications Act of 1934, as amended, which contains no provision for a judicial review, barred the bringing of a private cause of action to recover damages for a violation of that Act. Lar Daly v. Columbia Broadcasting System, 7 Cir., 309 F.2d 83.

Plaintiffs argue that although the Housing Act says nothing about a judicial review, Section 10 of the Administrative Procedure Act (5 U.S.C. § 1009) does so provide.

Section 10(a) of the Act (5 U.S.C. § 1009(a)) provides: "Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof." Subsection (c) refers to " * * * [A]nd every final agency action for which there is no other adequate remedy in any court, shall be subject to judicial review."

■ Plaintiffs, in effect, argue that Section 10(a) and (c) confers standing upon any one who suffers economic injury as a result of agency action regardless of whether that person's private legal rights are violated. We do not think that this is a permissible interpretation.

The proper interpretation of Section 10 appears in Kansas City Power and Light Company et al. v. McKay, 96 U.S.App.D.C. 273, 225 F.2d 924. The Court there held that certain electrical utilities did not have standing to attack the validity of a federally operated power program. The Court said, at page 932: ƒ"Section 10(a) is for the benefit of 'any person suffering legal wrong', that is, one whose legal rights have been violated ƒ As we have seen, these plaintiffs cannot effectively make such a claim. Nor are we confronted with any relevant statute within the meaning of which the plaintiffs are 'adversely affected or aggrieved.' Plaintiffs-appellants cite and rely on the view expressed in American President Lines v. Federal Maritime Board, D.C.D.C.1953, 112 F.Supp. 346, at page 349, which would in effect delete from Section 10(a) the phrase 'within the meaning of any relevant statute'. That view cannot of course, be accepted."

This interpretation of Section 10 was followed in two cases involving unsuccessful attempts to review administrative action under the Housing Act of 1949. Taft Hotel Corporation v. Housing & Home Finance Agency et al., D.C.Conn., 162 F.Supp. 538, aff'd 2 Cir., 262 F.2d

307; Gart et al. v. Cole et al., S.D.N.Y., 166 F.Supp. 129, aff'd 2 Cir., 263 F.2d 244.

Other courts, without specific discussion of the Administrative Procedure Act, have dismissed complaints on the ground the plaintiffs had shown no injury to their private rights. Allied-City Wide Inc. et al. v. Cole, 97 U.S.App.D.C. 277, 230 F.2d 827; Pittsburgh Hotels Association, Inc. v. Urban Redevelopment Authority of Pittsburgh, W.D.Pa., 202 F. Supp. 486. Each of these decisions concerned the Housing Act of 1949.

■ We hold plaintiffs herein do not have a right of judicial review of the Agency action herein, pursuant to Section 10 of the Administrative Procedure Act.

Plaintiffs had no objection, in fact, they favored the original slum clearance program. They voiced vigorous objections, however, when the proposed plan for redevelopment of the area was changed from residential and commercial uses to the University of Illinois—Chicago campus, project. They argued that their interests and the interests of the community would be better served were the area to be redeveloped for residential and commercial use.

■ The use to which plaintiffs desired the land to be put is undeniably a lawful public use. But using the area acquired as a site for the Chicago branch of the University of Illinois is likewise a lawful public use. Courts have consistently denied the standing of citizens to challenge the choice made by public authorities between different and competing public uses. The legislature, through its lawfully created agencies, rather than "interested" citizens, is the guardian of the public needs to be served by social legislation. Koehler v. Century of Progress, 354 Ill. 347, 188 N.E. 445; Carstens v. City of Wood River, 344 Ill. 319, 176 N.E. 266; and McPike v. Illinois Terminal Railroad Company, 305 Ill. 298, 137 N.E. 235.

Perhaps the leading case on this point is Berman et al. v. Parker et al., 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27. In a District of Columbia slum clearance program, plaintiffs were the owners of a department store in the area affected. Plaintiffs claimed their property was in good condition and should not be designated as slum property. Objection was further made that it was planned to put this store in a project under the management of a private agency, and the area was to be redeveloped for private, not public use. Plaintiffs argued their property was being taken from them in violation of two mandates of the Fifth Amendment, to-wit: due process and "nor shall private property be taken for public use without just compensation."

The Supreme Court said, page 33, 75 S.Ct. at 102: "We do not sit to determine whether a particular housing project is or is not desirable." Also, "If those who govern the District of Columbia decide that the Nation's Capitol should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way."

As to the role of the judiciary in such case, the Court said, page 32, 75 S.Ct. at 102: "In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia * * * or the States legislating concerning local affairs. * * *. This principle admits of no exception merely because the power of eminent domain is involved. The role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one."

In the instant case, the means chosen by the local authorities are a sale of a substantial portion of the area to the University of Illinois for redevolopment as a university campus, and the employment of private enterprise for redevelopment of the balance for residential use. There can be no doubt that these are proper public purposes and uses.

Pertinent also is the case of Zurn v. City of Chicago, 389 Ill. 114, 59 N.E.2d 18. There the Court rejected an attack on the constitutionality of the Illinois Neighborhood Redevelopment Corpora-

tion law, a statute quite similar to the Blighted Areas Redevelopment Act. The Illinois Supreme Court said, at page 129, 59 N.E.2d at 25: " * * * When such areas have been reclaimed and the redevelopment achieved, the public purpose has been fully accomplished. * * * The achievement of the redevelopment of slum and blight areas, as defined in the act, in our opinion, constitutes a public use and a public purpose, regardless of the use which may be made of the property after the redevelopment has been achieved." See also, Chicago Land Clearance Commission v. White, 411 Ill. 310, 104 N.E.2d 236 and Ross v. Chicago Land Clearance Commission, 413 Ill. 377, 108 N.E.2d 776.

On the basis of these and other authorities none of the plaintiffs have any private legal or vested interest in the type of public use redevelopment to be conducted in the area after the land has been acquired and the slums have been cleared. We so hold.

Plaintiffs argue the pending condemnation suits in the Illinois state court do not offer to them an adequate forum for the vindication of their rights. One reason presented is that a state court has no jurisdiction of the Housing and Home Finance Agency.

■ In this connection, we consider the motion of HHFA for dismissal of the suit against it on the ground that it is a nonsuable agency of the United States. We think this view is sound. This agency is an agency of the executive branch of the United States government. In New Haven Public Schools v. General Services Administration, 7 Cir., 214 F.2d 592, at page 593, this Court stated: "It is admitted that the two defendants [General Services Administration and Public Housing Administration] dismissed by the District Court are agencies of the executive branch of the United States government. In other words, they are administrative departments of the government. It has long been established that such agencies are not truly juridical persons but are strictly representatives of the government, who may not be sued in evasion of sovereign immunity."

We have no right or justification to speculate that the state courts of Illinois will not protect any rights the plaintiffs may have. The United States Supreme Court and other federal courts have repeatedly refused to entertain suits in which plaintiffs' personal or private legal rights have not been infringed and could be infringed only by an improper judgment in a condemnation proceeding. State of Georgia v. Chattanooga, 264 U.S. 472, 483–484, 44 S.Ct. 369, 68 L.Ed. 796; Amalgamated Clothing Workers of America et al. v. Richmond Brothers Co., 348 U.S. 511, 518–519, 75 S.Ct. 452, 99 L.Ed. 600; Southern California Petroleum Corporation v. Harper, 5 Cir., 273 F.2d 715.

In Shapiro v. Chicago Land Clearance Commission, 19 Ill.App.2d 461, at pages 464–465, 154 N.E.2d 329 at page 331 it was stated: "The decision of the Commission was merely one of the steps prerequisite to the exercise of the power of eminent domain (Zurn v. City of Chicago, 389 Ill. 114, 133, 59 N.E.2d 18) in the event of which plaintiffs will have an opportunity to be heard 'on each alleged infringement of their rights' * * *."

Plaintiffs have urged additional reasons why they are entitled to relief in a federal court action. We have considered same and hold them to be without merit.

Defendants likewise suggested additional defenses, but in view of our holdings hereinbefore indicated, we shall not discuss them.

Insofar as a legal controversy is presented, it properly belongs in the Illinois State Courts.

As plaintiffs have failed to establish any standing to sue in this federal court action, and have failed to raise a substantial federal question, the decision of the District Court, dismissing the amended complaint, must be and is

Affirmed.