373 F.2d 1
 GREEN STREET ASSOCIATION, James Batts, Velma Batts, and all other plaintiffs named in the Complaint, Plaintiffs-Appellants,
v.
Richard J. DALEY, City of Chicago, Department of Urban Renewal of the City of Chicago, Lewis W. Hill, Robert C. Weaver, William L. Slayton and A. Dean Swartzel, Defendants-Appellees.
 No. 15619.
 United States Court of Appeals Seventh Circuit.
 January 25, 1967.
 
 COPYRIGHT MATERIAL OMITTED Richard F. Watt, Helen Hart Jones, Irving M. King, Cotton, Watt, Jones & King, Chicago, Ill., for appellant.
 Merrill A. Freed, Joel Sprayregen, Ronald H. Silverman, Chicago, Ill., for amicus curiae.
 Thomas A. Foran, Sp. Asst. Corp. Counsel, Chicago, Ill., Alan S. Rosenthal, Dept. of Justice, Martin Jacobs, Atty., Washington, D. C., Raymond F. Simon, Corp. Counsel, Edward V. Hanrahan, U. S. Atty., Chicago, Ill., J. William Doolittle, Acting Asst. Atty. Gen., Robert V. Zener, Atty., Dept. of Justice, Washington, D. C., for appellees, Robert E. Wiss, Chicago, Ill., of counsel.
 Before CASTLE, SWYGERT, and CUMMINGS, Circuit Judges.
 SWYGERT, Circuit Judge.
 
 
 1
 This appeal is from a dismissal[1] of an action filed by the Green Street Association, a not-for-profit corporation organized to protect and promote the interests of residents of a section of Chicago known as the Central Englewood Area, and approximately 125 individual Negroes who are owners or lessees of property in this section of the city. The plaintiffs sought a judicial review of an urban renewal project covering the area.
 
 
 2
 The Central Englewood Area is part of a much larger section of Chicago which in 1956 was designated as the Englewood Conservation Area by the Chicago Community Conservation Board pursuant to the urban renewal statutes of Illinois. This section consists of more than 3,000 acres of land and has a population of approximately 140,000 people. A conservation plan for this area was adopted by the Chicago City Council in 1962. Subsequently, a number of redevelopment projects covering portions of the area were planned and approved. Among these is the Central Englewood Project, consisting of an area of approximately seventy-five acres. Within the Project area there are twenty-two acres of residential property and twenty-seven acres on which approximately 150 structures of a nonresidential character are located. The initial surveying and planning work of the Project was started in 1961 by the Chicago Community Conservation Board. The work was partially financed by the federal government pursuant to the provisions of 42 U.S.C. § 1452. Thereafter the Chicago Department of Urban Renewal, successor to the Community Conservation Board, prepared a redevelopment plan for the area pursuant to the provisions of the Illinois Urban Renewal Consolidation Act of 1961, Ill.Rev.Stat. ch. 67½, §§ 91.101-91.136 (1965), and in July 1964 the Chicago City Council passed an ordinance approving the plan, which calls for an expenditure of public funds in excess of thirteen million dollars. The Project was organized, planned, and presented pursuant to regulations prescribed by the Housing and Home Finance Agency under the federal urban renewal statutes, 42 U.S.C. §§ 1450-1465.
 
 
 3
 The Project will entail the construction and reconstruction of various streets, bypasses, and parking lots associated with and incident to the revitalization of a shopping center which services the entire Englewood area. This work will require the acquisition by eminent domain of approximately 300 buildings, consisting of about 600 dwelling units, eighty-five per cent of which are occupied by Negroes. Plaintiffs seek to enjoin the acquisitions and to have the Central Englewood Project declared invalid.
 
 
 4
 It is the theory of the complaint that the Central Englewood Project is not a good faith urban renewal, but rather a deliberate plan to create a no-Negro "buffer zone" between the shopping area and the surrounding residential community so that the shopping area will be more attractive to white customers and thereby rescue the commercial trade and business of the area from a declining condition. The plaintiffs also contend that this urban renewal plan fails to satisfy constitutional requirements of due process and freedom from discrimination to which the plaintiffs are entitled, since it was approved by the Chicago City Council without an adequate hearing and because it proposes a relocation of the residents in the cleared area in accordance with segregated housing patterns prevalent in Chicago. In this appeal, the plaintiffs challenge the dismissal of three of the five counts contained in their original complaint.
 
 
 Count I
 
 
 5
 The plaintiffs in Count I invoke the jurisdiction of the federal courts under 28 U.S.C. § 1343, 42 U.S.C. § 1983, and section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. They allege that approximately four-fifths of the housing to be cleared under the Central Englewood Project meets the city's definition of "standard" housing; that the parking facilities in the area are already excessive; that due to an increased concentration of Negro residents within the Englewood area the volume of business transacted in the shopping center has steadily declined; that a conspiracy exists to deprive the plaintiffs from owning or leasing property adjacent to the shopping center; and that the conspiracy started about 1953 among the "commercial interests" located in the center in order to create a no-Negro "buffer zone" between the shopping area and the surrounding residential community, thereby making the shopping area more attractive to white customers. The plaintiffs further allege that the City of Chicago, its mayor, the city's Department of Urban Renewal, and that department's executive officer "were induced" to join the conspiracy and that these defendants have "knowingly, wilfully and under color of law" proposed to use their official powers, including the power of eminent domain, to accomplish the object of the conspiracy. The urban renewal project for the Central Englewood Area is alleged to have been planned and approved in furtherance of the conspiracy. Finally, it is alleged that unless enjoined, the defendants by reason of their conspiratorial conduct will deprive the plaintiffs of rights to own, lease, hold, and enjoy property in violation of section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1982.[2]
 
 
 6
 The district court in dismissing Count I relied heavily on this court's decision in Harrison-Halsted Community Group, Inc. v. Housing & Home Fin. Agency, 310 F.2d 99 (7th Cir. 1962), cert. denied, 373 U.S. 914, 83 S.Ct. 1297, 10 L.Ed.2d 414 (1963). The plaintiffs, in maintaining that this count states a claim for relief, place equal reliance on this court's decision in Progress Dev. Corp. v. Mitchell, 286 F.2d 222 (7th Cir. 1961).
 
 
 7
 In Harrison-Halsted the plaintiffs, certain businessmen, property owners, and residents of a blighted area on Chicago's near west side, sought to enjoin various federal, state, and local government officials from proceeding with an urban renewal program. Jurisdiction to obtain judicial review of the program was based on two grounds, federal question jurisdiction under 28 U.S.C. § 1331, and jurisdiction to review federal agency action under section 10 of the Administrative Procedure Act, 5 U.S.C. § 1009. No claim under any of the Civil Rights Acts was asserted. Although the plan of urban renewal was attacked generally, the central contention of the plaintiffs was that their interests and those of the community would be better served were the area redeveloped for residential and commercial use, as originally planned, rather than for use as a university site, as later determined. We held that the plaintiffs had presented no substantial federal question and had no standing to sue because the acts complained of did not constitute an invasion of their private legal rights as distinguished from their position as members of the community and because neither the Housing Act of 1949 nor the Administrative Procedure Act conferred such private rights upon them.
 
 
 8
 In Progress, a real estate development corporation purchased land in the village of Deerfield, Illinois and announced that it planned to sell a portion of the houses to be constructed on the land to Negroes. The village officials, upon learning of the plan, took steps to condemn the land, allegedly for use as a park. The plaintiffs, the developer and its parent corporation, filed an action in the federal district court to enjoin the condemnation by the village and its park district and to recover damages from the individual officials on the ground that the corporations' civil rights were being violated. Jurisdiction was based on the provisions of various Civil Rights Acts, including 42 U.S.C. §§ 1983 and 1985. The district court dismissed the complaint. We reversed holding that the complaint stated a "federal cause of action." We ruled that the plaintiffs were entitled to relief if it could be shown that the sole purpose of the village and its officials in instituting the condemnation proceeding was to conspire to deny the plaintiffs equal protection of the laws as alleged in the complaint.
 
 
 9
 Thus, at least insofar as jurisdictional allegations are concerned, Harrison-Halsted is inapplicable to Count I in the instant case, and at first blush it appears that the claim of civil rights violations asserted by the plaintiffs in this count is controlled by Progress. There are, however, significant differences both from the standpoint of the facts alleged and in terms of the practical and efficient administration of urban renewal programs generally which make the holding in Progress inapposite here and require that the dismissal of Count I be affirmed.
 
 
 10
 In Progress the municipal officials moved to take the plaintiff's property by exercising the power of eminent domain immediately after the plaintiffs' announcement that Negroes would have the opportunity to purchase homes in the subdivision to be developed. The complaint alleged that the Deerfield officials in so doing were not acting in furtherance of any public purpose, but solely to acquire the property in violation of the plaintiffs' right to do business. These particular allegations prompted consideration of the complaint as essentially involving civil rights rather than as raising specific questions relating to eminent domain. Eminent domain was relevant there only to the extent that the exercise of the power per se might prove to be an abuse of that power causing a denial of equal protection guaranteed by the Civil Rights Acts and the Constitution.
 
 
 11
 In the case at bar the Central Englewood Project is an integral part of a large conservation and urban renewal program undertaken by the City of Chicago. Presumptively, at least, the land to be acquired will aid the redevelopment of a shopping center for the entire area and will be used for the construction of streets, bypasses, a pedestrian arcade and mall, and parking lots. The plaintiffs do not challenge the exercise of the eminent domain power per se; instead, they challenge the power to condemn only as it manifests itself in the details of a particular plan of urban renewal. Thus, for example, although the plaintiffs assert that the parking facilities provided in the plan are excessive and that no revitalization of the area covered by this portion of the plan is necessary, they make no claim that the acquired land will be devoted to anything other than a public use. Nor do they claim that the project was designed solely to deprive them of their rights to own and occupy the dwellings to be cleared. The plaintiffs challenge only the motives for fashioning the plan in the specific manner in which it was accomplished. Therefore, the exceptional circumstances in the Progress case, the significant sequence of events and factual allegations, are not present and the instant case is more properly considered as an attempt to obtain federal judicial review of a program of urban renewal prior to the exercise of the power of eminent domain.
 
 
 12
 When Count I is viewed as involving the power of eminent domain in this manner, the allegations assume a different cast. It is commonplace to recall that the power of eminent domain is an attribute of sovereignty. "The taking of private property for public use upon just compensation is so often necessary for the proper performance of governmental functions that the power is deemed to be essential to the life of the state." State of Georgia v. City of Chattanooga, 264 U.S. 472, 480, 44 S.Ct. 369, 370, 68 L.Ed. 796 (1924). Every person who acquires or occupies land does so at the risk of being evicted by the exercise of the superior right of the state or its delegate to acquire his interest upon payment of just compensation. The power of eminent domain is legislative in character. Given a public purpose or use, the motives that underlie the exercise of that power may not be questioned. Atlantic Coast Line R. R. v. Town of Sebring, 12 F.2d 679 (5th Cir. 1926); City of Chicago v. R. Zwick Co., 27 Ill.2d 128, 188 N.E.2d 489, appeal dismissed, 373 U.S. 542, 83 S.Ct. 1538, 10 L.Ed.2d 687 (1963). Although the actual purpose for which land is condemned may be investigated, the subjective reasons of the legislative authority seeking the acquisition is an "inappropriate area for judicial inquiry." Deerfield Park Dist. v. Progress Dev. Corp., 22 Ill.2d 132, 140, 174 N.E.2d 850 (1961). Since the plaintiffs do not allege in Count I either that the land is not being taken for a public purpose or that the land is being taken solely to deprive the plaintiffs of rights secured to them by the equal protection clause, they have not stated a claim within the area made accessible by Progress Dev. Corp. v. Mitchell, supra.
 
 
 13
 Further, in nearly all cases the question of whether the land to be acquired will be devoted to a public purpose is more appropriate for the state court to make in the condemnation proceedings. Zurn v. City of Chicago, 389 Ill. 114, 59 N.E.2d 18 (1945). The plaintiffs' claim that a portion of the urban renewal project is merely a sham or ruse to accomplish Negro clearance can be encompassed within the issues there, at least insofar as it relates to the actual purpose of the taking, as distinct from the motives that may have actuated the legislative body. It must be assumed that the state court will protect the plaintiffs' federal constitutional rights. "The state courts are as firmly bound by the Constitution of the United States as is this [federal] Court and [the proper] forum for the enforcement of any constitutional rights that may have been violated is in the * * * state courts with the right of ultimate determination by the Supreme Court of the United States." Baber v. Texas Util. Co., 228 F.2d 665, 666 (5th Cir. 1956). This principle has been applied in a number of other cases concerning the power of eminent domain. Georgia v. City of Chattanooga, supra; National Quarries Co. v. Detroit, T. & I. R. R., 10 F.2d 139 (6th Cir. 1926); Carver Progressive Club v. Miriana, 192 F.Supp. 825 (E.D.Mich.1960), aff'd per curiam, 288 F.2d 889 (6th Cir.), cert. denied, 368 U.S. 818, 82 S.Ct. 32, 7 L.Ed.2d 24 (1961); Hoffman v. Stevens, 177 F.Supp. 898 (M.D.Pa.1959). Accord, Harrison-Halsted Community Group, Inc. v. Housing & Home Fin. Agency, supra.
 
 
 14
 In summary, therefore, cases presenting challenges to urban renewal programs are matters for the condemnation proceedings in the state courts if the taking is ostensibly for a public purpose, even though violations of federally guaranteed rights are claimed. Only in those exceptional cases like Progress, where the facts alleged indicate to all outward appearances that the taking is designed solely to deny constitutional rights, is the power of eminent domain subject to the prior scrutiny of the federal courts. We hold that the district court was correct in dismissing Count I.
 
 
 Count II
 
 
 15
 Count II names both the local and the federal defendants. It alleges that at the public hearing on the Central Englewood Project, conducted by a committee of the Chicago City Council, the plaintiffs were limited to reading a prepared statement, that they were harassed and intimidated, and that they were denied the opportunity to cross-examine the defendants and the witnesses supporting the Project. Count II also alleges that the public notice required for the hearing was defective and that the committee's conclusions were dictated in advance by certain defendants or persons unknown. For these reasons it is asserted that the hearing did not conform to the requirements of section 105(d) of the Housing Act of 1949, 42 U.S.C. § 1455(d),[3] and denied the plaintiffs due process. The plaintiffs seek to enjoin all defendants from proceeding to carry out the Project until a "full and fair public hearing on it has been held in compliance with law. * * *" For jurisdictional purposes, they rely on 28 U.S.C. § 1331 and section 10 of the Administrative Procedure Act, 5 U.S.C. § 1009.
 
 
 16
 In Harrison-Halsted Community Group, Inc. v. Housing & Home Fin. Agency, supra, similar claims of the inadequacy of a hearing were made, supported by the same jurisdictional allegations. As has already been stated, we held there that neither section 105(d) of the Housing Act nor section 10 of the Administrative Procedure Act provides the basis for a federal right to judicial review of an urban renewal plan. We see no reason to reexamine our position in that case. Moreover, no substantial federal question of due process is raised. Rindge Co. v. Los Angeles County, 262 U.S. 700, 709, 43 S.Ct. 689, 67 L.Ed. 1186 (1923); Combs v. Illinois State Toll Highway Comm., 128 F.Supp. 305 (N.D. Ill.1955). The district court properly dismissed Count II.
 
 
 Count IV
 
 
 17
 Count IV names both the local and the federal defendants. In it the plaintiffs allege that the relocation provisions of the Urban Renewal Plan for the Central Englewood Area are deficient in two respects. First, they allege that the relocation provisions are not "feasible" as required by section 105(c) of the Housing Act of 1949, 42 U.S.C. § 1455(c), in that persons displaced from the Project area will be forced to move into housing which is not "decent, safe, and sanitary" or will be forced to pay more for housing than they are presently paying. Second, they allege that "the existence of a segregated residential pattern in the City of Chicago is expressly acknowledged in the Urban Renewal Plan * * * wherein separate relocation facilities based on race, for persons to be displaced from the project area, are given," thus rendering the Plan violative of section 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.[4] The plaintiffs allege that in approving the Plan despite these provisions the local and federal defendants are acting in violation of the plaintiffs' rights to equal protection of the laws. The plaintiffs request a declaration that the Plan is invalid and seek to enjoin all defendants from proceeding with it "until an adequate, realistic, and feasible method of relocation is devised in accordance with law."
 
 
 18
 The plaintiffs renewed attack on the Plan in terms of the Housing Act of 1949 is again subject to the rule stated in the Harrison-Halsted case, discussed earlier. The plaintiffs have no standing to litigate questions arising from alleged violations of the act.[5]
 
 
 19
 The plaintiffs' remaining contention with respect to Count IV is that the Plan's "recognition" of the segregated nature of residential facilities in Chicago subjects them to "discrimination under [a] program * * * receiving Federal financial assistance" within the meaning of section 601 of the Civil Rights Act of 1964 and that this section implicitly confers standing upon them to sue to enjoin violations of it. As to the federal defendants, the plaintiffs' argument is erroneous in that it ignores the remaining sections of Title VI of the act. Sections 602 and 603 of the act, 42 U.S.C. §§ 2000d-1,[6] 2000d-2,[7] establish the procedure to be followed by federal officials in enforcing the nondiscrimination requirements of section 601. Only after the appropriate federal agency has followed this procedure is judicial review permitted by section 603. If an individual suit for an injunction against the federal officials were permitted, the administrative procedure would be bypassed. We do not think that section 601 was intended to permit the termination of federal participation in a given program by this means.
 
 
 20
 As to the local defendants, the plaintiffs argue that Lemon v. Bossier Parish School Bd., 240 F.Supp. 709 (W.D. La.1965), aff'd, No. 22675, 5th Cir., January 5, 1967, holds that individuals being subjected to discrimination under a program receiving assistance have standing to sue local officials for relief under section 601. In Lemon it was held that a local school board, having received federal funds, could be compelled to refrain from discrimination by means of a suit brought by private persons under this section. But even assuming, arguendo, the merits of that decision, in our view Count IV of the plaintiffs' complaint in this case was properly dismissed for failure to state a claim upon which relief can be granted. The complaint alleges, in various terms, that the relocation facilities proposed in the Urban Renewal Plan "recognize" or "acknowledge" the segregated residential pattern existing in Chicago.[8] It does not, and realistically cannot, allege that the relocation machinery established by the Plan forces or compels displacees from the Project to relocate in segregated areas of the city. The existing "segregated" residential pattern is accidental to the Plan. The city admittedly could not require relocation in any particular area; it may only determine what housing is available in fact and offer whatever assistance it can in furnishing this information to displacees. The local defendants may not be enjoined from proceeding with the Plan simply because the Plan fails to include what the local defendants would be powerless to enforce — "integrated" relocation. Count IV was properly dismissed.
 
 
 21
 The judgment of the district court is affirmed.
 
 
 
 Notes:
 
 
 [1]
 Green Street Ass'n v. Daley, 250 F.Supp. 139 (N.D.Ill.1966)
 
 
 [2]
 42 U.S.C. § 1982 reads: All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property
 
 
 [3]
 42 U.S.C. § 1455(d) reads:
 No land for any project to be assisted under this subchapter shall be acquired by the local public agency except after public hearing following notice of the date, time, place, and purpose of such hearing.
 
 
 [4]
 42 U.S.C. § 2000d reads:
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
 
 
 [5]
 Nor do we think that section 601 of the Civil Rights Act of 1964 confers standing upon the plaintiffs to raise questions concerning the Plan's compliance with the provisions of the Housing Act of 1949
 
 
 [6]
 42 U.S.C. § 2000d-1 reads:
 Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.
 
 
 [7]
 42 U.S.C. § 2000d-2 reads:
 Any department or agency action taken pursuant to section 2000d-1 of this title shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds. In the case of action, not otherwise subject to judicial review, terminating or refusing to grant or to continue financial assistance upon a finding of failure to comply with any requirement imposed pursuant to section 2000d-1 of this title, any person aggrieved (including any State or political subdivision thereof and any agency of either) may obtain judicial review of such action in accordance with section 1009 of Title 5, and such action shall not be deemed committed to unreviewable agency discretion within the meaning of that section.
 
 
 [8]
 The plaintiffs complain that the relocation provisions of the Plan will not make integrated residential facilities available to them despite their acknowledgment of the existing residential pattern and despite their own assertion that Negroes constitute 85 per cent of the population in the area in which they presently live