NORWALK CORE, also known as Norwalk Chapter, Congress of Racial Equality, Spring Street Tenants Association and Day Street-Washington Village Tenants Association, on Behalf of themselves, their members and all others similarly situated, Faree Seals, William Blunt and Dollie Blunt, James Mosley, Jr. and Julia Mosley, Alejandro Ortiz, Charles Bentley and Lucille Bentley, on Behalf of themselves and all others similarly situated, Plaintiffs,

v.

NORWALK REDEVELOPMENT AGENCY, also known as Redevelopment Agency of the City of Norwalk et al., Defendants.

Civ. No. 12017.

United States District Court
D. Connecticut.

July 27, 1967.

**618**

Lubell & Lubell, Jonathan W. Lubell, New York City, Stephen L. Fine, Westport, Conn., for plaintiffs. Dennis J. Roberts, Newark, N. J., of counsel.

·_ Vincent D. Flaherty, Norwalk, Conn., for Norwalk Redevelopment Agency and its members.

Thomas A. Flaherty, Norwalk, Conn., for City of Norwalk and Frank N. Zullo, Mayor and Charles Marshall, City Clerk.

Samuel Sallick, Norwalk, Conn., for Norwalk Housing Authority and its members.

Jon A. Newman, U. S. Atty., Robert Glass, Asst. U. S. Atty., New Haven, Conn., for Robert C. Weaver, Secretary and Charles Horan, Assistant Regional Administrator.

Robert A. Slavitt, Norwalk, Conn., for David Katz and Sons and Towne House Gardens, Inc.

ZAMPANO, District Judge.

## MEMORANDUM OF DECISION

In this action plaintiffs seek to enjoin certain local and federal officials, as well as private developers, from proceeding with construction of a 90-unit moderate-income housing project on a six-acre tract of land in a large urban renewal project in Norwalk, Connecticut. The six-acre tract is the last substantial parcel of land in the project which is to be developed.

The plaintiffs include three nonprofit associations, Norwalk Core (Norwalk Chapter, Congress of Racial Equality), Spring Street Tenants Association, and Day Street-Washington Village Tenants Association. These associations, composed of low-income Negroes and Puerto Ricans, bring this action "on behalf of themselves, their members and all others similarly situated." In addition to the associations there are eight individual plaintiffs, who bring this action "on behalf of themselves and all others similarly situated." Each represents a "subdivision" of "one overall class" of low-income Negroes and Puerto Ricans "who lived in Norwalk during the Urban Renewal program there and who were subjected to discrimination on account thereof." See, Plaintiffs' Supplementary Memorandum of Law, pg. 15. As defined in the complaint, these subdivisions are: 1) persons who presently occupy building structures in the project area, represented by plaintiffs William and Dollie Blunt and Alejandro Ortiz; 2) individuals whose homes located in the project area have been demolished and who now occupy "overcrowded" rental units outside the project area in the City of Norwalk, represented by plaintiffs James Mosley, Jr. and Julia Mosley; 3) former residents of the project area who occupy rental units in the City of Norwalk at "excessive rentals," represented by plaintiff Seals; and 4) individuals who formerly lived within the project area and now occupy homes outside the

City of Norwalk, represented by Charles Bentley and Lucille Bentley.

Defendants are the Norwalk Housing Authority, its Executive Director and its members; the Norwalk Redevelopment Agency, its Administrator and its members, the City of Norwalk, its mayor and city clerk; Towne House Gardens, Inc., David Katz & Sons, Inc., Charles J. Horan, Assistant Regional Administrator for Renewal Assistance of the United States Department of Housing and Urban Development, and Robert C. Weaver, Secretary of the United States Department of Housing and Urban Development.

All defendants have filed motions to dismiss on numerous grounds.

## I

The plaintiffs' complaint, moving papers, exhibits, affidavits, and briefs reveal the following facts which, for the purposes of the motions before the Court, are accepted as true.

In 1958, the local Agency applied for survey and planning funds to commence a large urban renewal program in the City of Norwalk. After preliminary plans were drawn and proper approvals obtained, the Agency, in 1963, entered into a Loan and Capital Grant Contract with the Housing and Home Finance Agency (now a part of the Federal Department of Housing and Urban Development or "HUD"), under the provisions of 42 U.S.C. § 1450 et seq. The plans called for the acquisition and demolition of many buildings and dwelling units affecting some 271 families, of which fewer than half were classified as "Negro" with the remaining families listed as "White". Plaintiffs assert, however, that many Puerto Rican families were placed in the category of "White" without further identification. Renewal construction plans called for the erection of buildings containing commercial and office space and, on the six acre tract of land here in question, a cooperative moderate-income housing project. Most of the nonresidential construction has been completed. It is the use of this six acre tract for moderate-income housing rather than low-income rental units that forms the basis of the instant action.

As part of its plans, the Agency established a Property Management-Relocation Office which had the responsibility of insuring that displaced families be relocated into decent, safe and sanitary housing, at rental or sale prices within their financial means. In June of 1962, the Agency reported 114 families proposed for low rent housing, with 60 families being classified as "White" and 54 as "non-white." At the time, the Agency reported in its Relocation Program that "[N]o shortage is expected in the supply of dwelling units available to low-income families * * *. [T]he turnover supply of low rent public housing units, State-aided moderate rental housing units, and housing for the elderly units * * * is fully adequate for meeting the relocation needs of low-income families within the Project Area."

After the project was well under way and relocation efforts were in full execution, it soon became apparent, according to plaintiffs, that the estimated turnover rate in public housing available for displaced low-income families was not materializing as estimated. It is alleged that vacancies in Housing Authority projects were running less than half the predicted number per month and that this was known to the local defendants by March, 1965. Despite this, they claim, the Agency continued to demolish the bulk of the residential housing in the Project Area and did not alter its plans so as to provide for low-income rental units rather than moderate-income housing on the project site.

In May, 1967, in one of its final acts in completion of the project, the Agency entered into a contract with defendant Towne House for the sale of the aforementioned six acres of land to be used for the purpose of building the moderate-income housing.

The plaintiffs concede the basic urban renewal plans, from inception, contemplated the erection of moderate-income housing on the six acres of land in question, that commercial and office space was constructed and leases were entered into in reliance upon these rental units being built, and that the defendant Katz, as "sponsor" of the redevelopment program, will commence legal action against the Agency if it does not fulfill its obligations under existing contracts which require completion of the project in conformity with the original plan.

Claiming a violation of the equal protection clause of the Fourteenth Amendment in Counts I and II of their complaint and, more specifically, a violation of 42 U.S.C. § 1455(c) in Count III, the plaintiffs, in effect, request this Court:

1) to enjoin the local defendants from taking any further action to construct moderate-income housing on the six acres of land in question;

2) to enjoin any further demolition of residences in the project until the occupants of existing dwellings are relocated into safe and decent housing, at reasonable rentals;

3) to rescind any contract for the transfer or sale of the said six acres of land;

4) to order the local Agency and Authority to erect, under the supervision of this Court, appropriate low-rental housing units on the said six acres of land.

The plaintiffs do not seek money damages.

*II*

A threshold question is whether this is a proper class action under Rule 23 of the Federal Rules of Civil Procedure. Rule 23(c) (1) provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it should be so maintained."

Rule 23(a) sets forth four specific prerequisites to a class action:

1) the class is so numerous that joinder of all members would be impracticable;

2) questions of law or fact common to the class exist;

3) claims or defenses of the representative parties are typical of those of the class;

4) the representative parties will fairly and adequately protect the interests of the class.

■ It is apparent to the Court that the present case does not qualify under Rule 23(a). The gravamen of the complaint is the alleged unlawful or unconstitutional action of the defendants in demolishing the plaintiffs' homes as part of an urban renewal program without providing them with safe, decent and sanitary relocation sites, within their financial means and reasonably proximate to their employment. This presents no issue of law common to the class. The defendants concede, as they must, that they are obliged by statute, 42 U.S.C. § 1455(c),[1] to provide displaced families in an urban renewal project with decent, safe, and sanitary dwellings, within their financial means and reasonably accessible to their places of employment. It is uncontroverted that al-

1. "There shall be a feasible method for the temporary relocation of individuals and families displaced from the urban renewal area, and there are or are being provided, in the urban renewal area or in other areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the individuals and families displaced from the urban renewal area, decent, safe, and sanitary dwellings equal in number to the number of and available to such displaced individuals and families and reasonably accessible to their places of employment * * *."

most 200 families have been relocated to date, 21 are on the current workload for relocation, and there are approximately 50 other families to be relocated in the future. Some are satisfied with the relocation efforts of the defendants; others are not. It seems obvious to the Court that testimonial evidence must be received and factual determinations must be made regarding each member of each of the specified subdivisions within the overall class in order to resolve whether each one is legally aggrieved. In effect, there may well be "271 trials within one trial." It, therefore, seems clear that there are no questions of fact common to the class but, rather, separate and perhaps disparate factual circumstances with respect to each displaced family's living conditions, places of employment, financial means and other relevant factors. These divergent factual circumstances are such that the named plaintiffs cannot fairly and adequately protect the interests of the class. To fragmentize the overall class into subdivisions avails the plaintiffs nothing; ultimately almost all the individual members would have to come before the Court to be heard. Carroll v. American Federation of Musicians of U. S. and Can., 372 F.2d 155, 162 (2 Cir. 1967); Eisen v. Carlisle & Jacquelin, 41 F.R.D. 147 (S.D.N.Y. 1966); Berger v. Purolator Products, Inc., 41 F.R.D. 542 (S.D.N.Y.1966); Hirschi v. B. & E. Securities, Inc., 41 F.R.D. 64 (D.Utah 1966).

Even assuming the standards of Rule 23(a) have been met, this action may be maintained as a class action only if it also meets one of the three following conditions of Rule 23(b):

1) the prosecution of separate actions by or against individual members of the class would create a risk of a) inconsistent or varying adjudications which would establish incompatible standards for the party opposing the class, or b) adjudications which would as a practical matter dispose of or impair the interests of class members not parties thereto;

2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby rendering appropriate injunctive relief with respect to the entire class;

3) the court finds that questions of law or fact common to the class predominate over such questions affecting only individual members and, in addition, that the class action is superior to other available methods or procedures for the fair and efficient adjudication of the controversy.

The plaintiffs' action fails to qualify under any one of these tests. Rule 23(b) (1) is not applicable because, as noted previously, the common rights sought to be adjudicated are already codified in 42 U.S.C. § 1455(c); the statute sets up a common standard of relief for the plaintiffs herein, leaving nothing for the court to decide except whether the rights of each of the individuals protected by the statute have been observed. Their rights would be adjudicated under a single compatible rule of law. These separate adjudications would not dispose of or impair the interests of the other members since concededly the Agency acted properly in some instances and improperly in others.

Moreover, the injunctive relief sought is not appropriate. This Court does not have the equitable power to grant the extensive, almost dictatorial, redress requested. Cf. State of Hawaii v. Gordon, 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 703–704, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Even if the Agency has failed, or grievously and wilfully neglected, to perform some of its legal obligations in the construction of a massive ur-

ban renewal project, the proper remedy, except in the most extraordinary circumstances, is not a sweeping repudiation or disruption of that project by the Court which will undoubtedly seriously affect and irreparably harm the public interest, confidence and treasury. Whatever remedies the plaintiffs may have, at law or through administrative processes, the scope of injunctive relief sought here is not appropriate.

Finally, the plaintiffs' suit does not fall within Rule 23(b) (3). As discussed hereinbefore, the questions of law or fact common to the overall members of the class do not predominate over those of the named plaintiffs. The class action, under the circumstances and issues presented in the instant matter, would only "degenerate in practice into multiple lawsuits separately tried." See, Notes of Advisory Committee on Rule 23. Therefore, the individually named plaintiffs may not maintain this lawsuit as a class action.

■■ Neither may the three associations, as parties to a class action, seek redress on behalf of their members since they are not themselves members of the classes whose rights they claim to be asserting. It is fundamental that in a class action those who claim to represent the class be, themselves, members of the class. Hackett v. Kincade, 36 F.R.D. 442 (N.D.Miss.1964); Nesbit v. Statesville City Board of Education, 232 F. Supp. 288 (W.D.N.C.1964), vacated on other grounds and remanded 345 F.2d 333 (4 Cir. 1965); compare, Mapp v. Board of Education of City of Chattanooga, 319 F.2d 571, 576 (6 Cir. 1963); see, Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 140–141, 71 S.Ct. 624, 95 L.Ed. 817 (1951). Plaintiffs' reliance upon NAACP v. State of Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) and Brewer v. Hoxie School District No. 46, 238 F.2d 91 (8 Cir. 1956), is misplaced. In those cases the plaintiffs, themselves, were subjected to the state action complained against. Here, the associations make no claim of being objects of state action nor do they claim deprivation of any rights in their individual capacities.

### III

■ Even if a class action were appropriate, the plaintiffs have no standing to challenge the official conduct here in question. Members of the public, whether living inside or outside a project area, ordinarily have no standing to challenge planning of an urban renewal project, see Harrison-Halsted Community Group, Inc. v. Housing and Home Finance Agency, 310 F.2d 99 (7 Cir. 1962), cert. denied 373 U.S. 914, 83 S.Ct. 1297, 10 L. Ed.2d 414 (1963), nor, by alleging civil rights violations, do they gain standing they would otherwise not have, see Green Street Association v. Daley, 373 F.2d 1 (7 Cir. 1967). See also, Johnson v. Redevelopment Agency of City of Oakland, Cal., 317 F.2d 872 (9 Cir. 1963). If residents of a project area cannot challenge a project while it is in the planning stages and before construction has begun, certainly they can have no standing to assert the same kind of challenge at a time when planning has been implemented, most of the land has been purchased and conveyed to developers, and construction of new buildings has been almost completed.

In *Harrison-Halsted* the plaintiffs, many of whom had owned property or lived within the project area, challenged a revision in the plan calling for elimination of planned moderate-income residential development in favor of use of the land for a University of Illinois campus. The court said:

"* * * in spite of the outraged feelings of many people who have interests in this area, we have in mind that questions arising from the taking of property by condemnation for state purposes, are ordinarily matters for determination by the state courts. The plaintiffs in this case have sought relief in a federal court. Whether

they may properly do so depends principally on whether they have a standing to sue and whether a substantial federal question is involved.

"We think it is well settled that in a private suit in a federal court, where it is claimed that a substantial federal question is involved, it must clearly appear that defendant's acts constituted the invasion of plaintiffs' private legal rights. Frothingham v. Mellon, Secretary of the Treasury et al., 262 U. S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. * * * "

Because the plaintiffs were not parties to the federal-local subsidy contract, the court held they had no standing to challenge the change in the project plan, stating:

"Courts have consistently denied the standing of citizens to challenge the choice made by public authorities between different and competing public uses. The legislature, through its lawfully created agencies, rather than 'interested' citizens, is the guardian of the public needs to be served by social legislation."

310 F.2d at 105.

The *Green Street* case [2] holds that the civil rights statutes do not provide a remedy for plaintiffs relocated pursuant to an urban renewal plan. In that case, as in the instant case, the plaintiffs alleged the plan recognized and acknowledged segregated residential patterns— not that it caused them or otherwise brought them about. The court, commenting that there could not reasonably be an allegation that the plan forced or compelled displacees to relocate in segregated areas of the city, said:

"The existing 'segregated' residential pattern is accidental to the Plan. The city admittedly could not require re-

location in any particular area; it may only determine what housing is available in fact and offer whatever assistance it can in furnishing this information to displacees."

373 F.2d at 9.

The defendants in the instant case admit they have a duty greater than the mere furnishing of information mentioned in *Green Street*. Their program is designed to prevent displacees from suffering any consequences or change in circumstances, if and when they are relocated into the discriminatory housing market. They cannot owe a greater duty to end a situation which is merely "accidental" to the plan.

Plaintiffs rely heavily upon Gart v. Cole, 263 F.2d 244, 251 (2 Cir. 1959), cert. denied 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959), in which the Second Circuit stated that displaced residents have standing to sue. They argue that the rule of law established there is contrary to the *Harrison-Halsted* and *Green Street* holdings. This Court does not so interpret Gart v. Cole. That case merely held that persons suffering specific injuries incidental to the implementation of a renewal project could seek redress in court. The type of redress allowable under Gart v. Cole is similar to that provided in Merge v. Sharott, 341 F. 2d 989 (3 Cir. 1965), which held that displaced businessmen have standing to sue to recover relocation compensation.

However, Gart v. Cole does not stand for the proposition that landowners and tenants have a right to drastic judicial intervention into a large, almost fully constructed, urban renewal project. The court, 263 F.2d at 250, stated the relevant statutory sections were designed "to protect not the interests of landowners or tenants in a redevelopment area, but those of the public at large." The *John-*

---

**2.** The allegations of the *Green Street* case were far more serious than in the instant case. There, the plaintiffs claimed the redevelopment project was a sham, intended solely to drive Negroes from a

section of Chicago. Here, defendants are charged merely with making an error in planning for relocation of displaced residents of the project area.

*son* case, which is in accord with *Green Street* and *Harrison-Halsted*, cites Gart v. Cole with approval for the proposition that those, not parties to the federal-local contract, "have no standing to enforce conditions imposed on redevelopment agencies by the United States, although those suing would benefit from such enforcement." 317 F.2d at 874. See also, Taft Hotel Corporation v. Housing and Home Finance, 162 F.Supp. 538 (D.Conn.1958), aff'd, 262 F.2d 307 (2 Cir. 1958), cert. denied 359 U.S. 967, 79 S.Ct. 880, 3 L.Ed.2d 835 (1959), holding that the plaintiff, as a taxpayer and one who claimed a new hotel in the city would cause economic injury, had no standing to challenge erection of a hotel in an urban renewal area.

Accordingly, the plaintiffs' action is dismissed as to all defendants.